1  KAREN P. HEWITT
   United States Attorney
2  SANJAY BHANDARI
   VALERIE H. CHU
3  JASON A. FORGE
   PHILLIP L. B. HALPERN
4  Assistant U.S. Attorneys
   California State Bar Nos. 189120/241709/181542/133370
5  Federal Office Building
   880 Front Street, Room 6293
6  San Diego, California 92101-8893
   Telephone:  (619) 557-7042/7837/7463/5165
7
   Attorneys for Plaintiff
8  United States of America

9

10              UNITED STATES DISTRICT COURT

11            SOUTHERN DISTRICT OF CALIFORNIA

12                                  )  Criminal Case No. 07CR0330-LAB
   UNITED STATES OF AMERICA,        )
13                                  )  **GOVERNMENT'S TRIAL MEMORANDUM**
                 Plaintiff,         )
14                                  )  DATE:      October 2, 2007
         v.                         )  TIME:      9:00 a.m.
15                                  )  Judge:     Honorable Larry A. Burns
                                    )
16  BRENT ROGER WILKES (1),         )
    JOHN THOMAS MICHAEL (2),        )
17                                  )
                 Defendants.        )
18                                  )
                                    )
19  _____ )

20        COMES NOW the plaintiff, UNITED STATES OF AMERICA, by and through its counsel,

21  Karen P. Hewitt, United States Attorney, and Sanjay Bhandari, Valerie H. Chu, Jason A. Forge, and

22  Phillip L.B. Halpern, Assistant U.S. Attorneys, and hereby files its Trial Memorandum.

23

24

25

26

27

28

                                          1                                    07CR0330-LAB

# I

## STATUS OF THE CASE

A.   INDICTMENT

On February 13, 2007, a federal grand jury in the Southern District of California returned a 26-count Indictment in this case.  The indictment charged defendant Brent Roger Wilkes with conspiracy to commit: honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346; bribery of a public official, in violation of 18 U.S.C. § 201(b)(1)(A); money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and § 1956(a)(1)(A)(i); and engaging in monetary transactions in property derived from specified unlawful activity, in violation of 18 U.S.C. § 1957 (Count 1).  The indictment further charged defendant Wilkes with honest services wire fraud, in violation of 18 U.S.C. §§ 1343, 1346 and 2 (Counts 2-18); bribery of a public official in violation of 18 U.S.C. § 201(b)(1)(A) and § 2 (Count 19); money laundering in violation of  18 U.S.C. § 1956(a)(1)(B)(i) and § 2 (Count 20); money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i) (Count 21-22); and unlawful monetary transactions, in violation of 18 U.S.C. § 1957 (Counts 23-24).  The indictment charged defendant John Thomas Michael with a single count of obstruction of justice, in violation of 18 U.S.C. § 1503 and 2 (Count 26).  The indictment included forfeiture allegations with respect to both defendants.

On May 10, 2007, the grand jury returned a Superseding Indictment, with identical charges as the original indictment but adding defendant Michael to Count 1 (conspiracy), Count 20 (money laundering), and Counts 23–25 (unlawful monetary transactions)[1] and alleging additional overt acts of the conspiracy.

B.   JURY TRIAL

Jury trial in this case is set to begin on October 2, 2007 for both defendants.  No jury waiver has been filed.

In light of medical issues that have arisen concerning defendant Michael, the Court has scheduled a status hearing on Friday, September 28, 2007 to issue a decision on Michael's motion to continue the trial date as to him.

---

[1]   As noted below, at this time the government moves to dismiss Counts 23 and 24 without prejudice with respect to defendant Michael only.

2

C.    STATUS OF COUNSEL

Defendant Wilkes is represented by retained attorney Mark J. Geragos.  Defendant Michael is represented by retained attorneys Raymond Granger, Richard Levitt, and Howard Frank.

D.    CUSTODIAL STATUS

Defendant Wilkes is out of custody on a $2,000,000 real property bond.  Defendant Michael is out of custody on a $250,000 personal appearance bond.

E.    INTERPRETER

The government will not need an interpreter for its case.

F.    LENGTH OF TRIAL

Due to the inability to predict the extent of cross-examination, it is difficult to accurately forecast the length of the trial.  At present, however, the government estimates that it may call 40 to 50 witnesses and its case-in-chief may require in excess of 15 trial days.

G.    COURTROOM COMPUTER SYSTEM

The government will be using a computer-based evidence presentation system including individual monitors located at the bench, the witness stand, and at counsel tables for the government and the defense.

H.    DISCOVERY

The United States has complied with its discovery obligations.  Defendant Wilkes has not produced any reciprocal discovery.  Defendant Michael has produced one box of bank records for Parkview Financial, an entity that does business with Coastal Capital and is controlled by co-conspirator and potential trial witness Thomas Kontogiannis.  Defendant Michael has produced no other reciprocal discovery.

I.    PRE-TRIAL MOTIONS

The Court conducted hearings on pretrial motions on March 19, 2007, April 2, 2007, May 14, 2007, July 23, 25, and 30, 2007, August 20, 2007, and September 4, 2007.

On March 19, the Court denied the motion by defendant Wilkes (having joined the motion of co-defendant Dustin Foggo in the related case, 07CR0329-LAB) for reconsideration of the scope of the protective order.  On April 2, 2007, the Court granted defendants' motion for leave to file additional pre-

trial motions, and defendant Wilkes withdrew his motion for a bill of particulars.  On May 14, 2007, the Court denied defendant Wilkes's motion to dismiss the indictment due to outrageous government conduct, granted defendant Wilkes's motion to compel investigation into Rule 6(e) violations,[2] and denied defendant Michael's motion to declare the case complex and for a continuance.  The Court set a trial date of September 18, 2007.

On July 23, 25, and 30, the Court considered the status of counsel for defendant Wilkes in the related case, and the motion by Mr. Geragos to be relieved from this case.  Ultimately, the Court disqualified Mr. Geragos from representing defendant Wilkes in the related case, but denied his motion to be relieved from representing Wilkes in the present case.

On August 20, 2007, the Court granted defendants' motion for a continuance of the trial date, ordered the government to produce a preliminary exhibit list, and moved the trial to October 2, 2007.

On September 4, 2007, the Court denied defendant Michael's motions to: (1) dismiss the indictment; (2) disqualify the U.S. Attorney's office, the assigned prosecutors, or Assistant U.S. Attorney Phillip Halpern; (3) preclude Thomas Kontogiannis from testifying; (4) obtain an audiotape of the grand jury proceedings; and (5) order the government to identify *Brady/Bagley/Giglio* information.  The Court deferred ruling on the renewed motion for a hearing regarding grand jury leaks, and granted defendant Michael's motion for a bill of particulars.

On September 25, 2007, the Court denied without prejudice defendant Michael's motion to continue the trial date, setting a further status hearing for September 28, 2007.  The Court confirmed defendant Wilkes's trial to start October 2, 2007, and rejected any opposition to a severance of the two defendants.

On September 25, 2007, the government filed motions *in limine* seven days before the scheduled hearing date as required by the Court's local rule.  The government moved *in limine* to: (1) preclude duress or necessity as a defense to bribery or honest services fraud, (2) preclude evidence or argument of alleged government misconduct, (3) admit certain evidence, and (4) preclude defense exhibits not produced in reciprocal discovery.

---

[2]     Defendant Wilkes filed this motion in the related case, which was thereafter deemed filed in the instant case by court order on April 25, 2007.

On September 25, 2007, counsel for the House of Representatives filed a motion on behalf of 12 members of the House of Representatives to quash subpoenas issued by defendant Wilkes for documents and testimony.

The Court will rule on the motions *in limine* and the motion to quash on October 1, 2007.

J.    EXHIBITS

The government has supplied a preliminary exhibit list to defense counsel.  The government will provide an updated list to the Court and to defense counsel on (or prior to) the scheduled trial date.  This list will be updated during trial to reflect additional exhibits that the government finds necessary to introduce.

K.    JURY INSTRUCTIONS

The government's proposed jury instructions will be submitted under separate cover.

**II**

**STATEMENT OF FACTS**

Over several years, defendants Brent Roger Wilkes and John Thomas Michael participated in a bribery and money laundering scheme that covertly conveyed millions of dollars in bribe money to then San Diego-area Congressman Randall "Duke" Cunningham.  Defendant Wilkes's bribes to Cunningham spanned the gamut from extravagant meals, to expensive toys, to prostitutes, and even wire transfers and checks for hundreds of thousands of dollars.  Defendant Michael, an experienced money launderer, concealed and disguised the source of more than a million dollars in bribes from defendant Wilkes, coconspirator Mitch Wade and Thomas Kontogiannis to Congressman Cunningham.  In return for these bribes from Wilkes, instead of the honest and loyal service he was elected and bound to provide, Cunningham in effect acted as Wilkes's hired gun, in Congress and in interactions with Defense Department ("DoD") officials who had the temerity to refuse Wilkes's demands for what he called "his money."

//
//
//
//

5

A.      THE CASE AGAINST BRENT WILKES

      1.      Wilkes Exploits the Opportunity to Buy Influence in Washington D.C.

Defendant Wilkes, a consultant-turned-government contractor, launched ADCS Inc. in 1995. His company purportedly specialized in converting paper records into electronic form. Wilkes's company targeted government contracts available through the Congressionally-created Automated Document Conversion Software ("ADCS") Program.

Almost from the inception of his new company, Wilkes began treating Cunningham, his hometown congressman, to lavish meals at high-end restaurants whenever Wilkes went to Washington. These meals often ran into the hundreds, if not thousands, of dollars. Wilkes – or one of his employees – always picked up the tab. Not infrequently, Wilkes would dispatch a limousine to retrieve Cunningham from Capitol Hill or the "Kelly C" (the houseboat in which he lived while in Washington) to the restaurant.

      2.      Wilkes Increases His Giving

Although Cunningham had previously supported the ADCS Program, in 1997 he attained a seat on the influential House Appropriations Committee ("HAC"), giving him more direct influence on congressional spending. That same year, while continuing to treat Cunningham to meals and limousine rides, Wilkes purchased a jet boat for over $10,000 for Cunningham's use and enjoyment, along with a $1,000 trailer to transport the boat. The jet boat was docked behind Cunningham's Kelly C at the Capital Yacht Club, and Cunningham enjoyed nearly exclusive use of it.

Cunningham increasingly emphasized the ADCS Program as one of his top legislative priorities. With Cunningham's support, the HAC added "earmarks" of $40 million (fiscal year ("FY") 1998) and $45 million (FY 1999) to the ADCS Program. Multiple contractors, supported by their respective congressmen, vied for the $40 million available in FY 1998 for the ADCS Program. Up to this time, ADCS, Inc. had capitalized on the ADCS Program funds by simply selling – at an enormous profit – VPMax Software, a product it licensed. In late 1998, however, ADCS, Inc. was the beneficiary[3] of a

---

[3]      Another company served as the contracting vehicle for this contract.

contract by the Office of the Secretary of the Defense ("OSD") to perform document conversion services related to the United States' transfer of ownership and control of the Panama Canal.

Cunningham pushed the Panama Canal project and the ADCS Program outside Congress as well. He personally telephoned numerous DoD employees to affirm his support for the ADCS Program and to express his displeasure if the program funds were not allocated as he expected. He also met personally with government employees and pressured them to direct funds specifically to ADCS, Inc.

### 3. Wilkes Works the System

In March 1999, Wilkes orchestrated a number of meetings between Cunningham and major DoD officials, including the high-ranking Principal Deputy Under Secretary for Defense, who was responsible for distributing billions of dollars in government contracts. In the face of Cunningham's pressure, DoD eventually gave ADCS Inc. almost 25% of the $45 million in 1999 funds for the ADCS Program – despite the fact that the Panama document conversion project was not selected among the top 14 projects that DoD wished to pursue with ADCS Program funds.

Wilkes continued to lavish Cunningham with meals, luxury transportation, and the exclusive use of the jet boat in 1998 and 1999. In addition, he also gave Cunningham a laptop, plane tickets, and a paid vacation in Las Vegas. When Cunningham's jet boat was damaged in a boating accident in 1999, Wilkes simply spent an additional $14,000 to buy the Congressman a new one and another $1,000 for another trailer. In addition, Wilkes spent an additional $7,000 on a new inflatable jet boat dock sought by Cunningham to house the new boat.

Cunningham's influence over the military continued to grow as he was appointed to a seat on the HAC's Defense Subcommittee (the "HAC-D") – the largest appropriations subcommittee, in 1999. From this position, he succeeded in securing an earmark dedicated to a separate line of funding (also referred to as a "plus-up" or "Congressional add") for a document conversion project for which ADCS, Inc. was slated to be the primary contractor. This program was referred to as FIRES ("Facilities, Infrastructure Engineering System"), and simply continued the legacy document conversion of the Panama Canal infrastructure that had been previously performed by ADCS, Inc. with funding from the ADCS Program. In 1999, Cunningham earmarked $4 million that would be exclusively used for this

project and thus would flow almost entirely to Wilkes's company, ADCS, Inc.[4]   When, in 2000, this allocated money did not flow swiftly to ADCS, Inc., Cunningham inserted himself into the implementation of the contract.  He made public comments in a March 2000 HAC-D hearing on army appropriations, calling for the dismissal of the Assistant Deputy Undersecretary of Defense for incompetence in "hanging on to" the $4 million.

### 4.   Wilkes Issues a Cash Payment

Wilkes continued to wine and dine Cunningham in an extravagant manner, and also began flying Cunningham on his private charted jet to a number of locations, including flights between San Diego and Washington, D.C.   These flights (which, at a minimum, should have been reimbursed by the Congressman with the dollar equivalent of a first class ticket) were catered with gourmet food and expensive wines.  More significantly, on May 1, 2000, Wilkes gave Cunningham $100,000 in two separate checks, ostensibly for the purchase of Cunningham's boat, the Kelly C.  In October 2000, Wilkes assumed the monthly payments on the Kelly C.  Cunningham continued to live on the Kelly C and experienced its full use and enjoyment.  He paid for its registration and insurance in his own name from 2000 to 2003.  In 2000, Wilkes also provided Cunningham with another computer and specialized navigational software for the Kelly C.

The day after the $100,000 "boat" payment, Cunningham's legislative director worked to advance a request for a $20 million earmark for the Global Infrastructure Data Capture ("GIDC") program.  Separate and apart from FIRES, GIDC was yet another separate document conversion program that could be directed solely toward ADCS, Inc., avoiding the skirmishes resulting from fighting over the funds in the general ADCS Program.[5]  For FY01, Cunningham was able to secure $20 million for GIDC and $4 million for FIRES, in addition to the $19 million which Congress authorized for the ADCS Program.

//

---

[4]      In addition, Cunningham also supported – along with other members of Congress – the continued growth of the ADCS Program, which received a $50 million earmark for the 2000 calendar year.

[5]      The purported aim of GIDC was to develop five document conversion centers around the world to digitize millions of engineering and infrastructure drawings and documents.

In 2001 and 2002, Wilkes continued to ply Cunningham with expensive meals, limousine service, continued use of the jet boat, and chartered flights to various locations around the United States. He also began lavishing Cunningham with luxurious vacations at exclusive destinations such as the Coeur d'Alene Resort in Idaho.

For his part, Cunningham continued to use his office to enrich Wilkes.  For example, when DoD considered allocating the FY01 $20 million earmark away from GIDC to a more pressing need, Cunningham and his office weighed in quickly and decisively, resulting in the full earmark going to ADCS, Inc.  Similarly, when the Deputy Under Secretary of Defense for Resources decided to award the $4 million FIRES funding to other companies that specialized in document conversion, Cunningham's office (at Wilkes's direction) acted swiftly in response.  Among other things, Cunningham threatened to have the Deputy Under Secretary fired, and inserted comments in the Congressional Record indicating his displeasure with how the program was being run.  Cunningham kept applying pressure until DoD agreed to replace the $4 million dollars by taking it out of supplemental funding that had been designated in 2001 to fight the war on terrorism.[6]

From this point on there was little real resistence by the DoD to Cunningham's programs and ADCS, Inc.'s demands – even when it was clear that ADCS, Inc. was shortchanging the government.

### 5.   Wilkes's Protégé Ups the Bidding for Cunningham

At roughly the same time, co-conspirator Mitch Wade began seeking Cunningham's support as well.  In the early 1990's, Wade (after leaving government service) started his own company, MZM.  In 1998, he began working as a consultant to ADCS, Inc.  With his contacts in the Department of Defense and insight into the way the Pentagon awarded contracts, he helped orchestrate the separate FIRES and GIDC line-items that benefitted ADCS, Inc.  By October 2001, Wade was trying to become a government contractor in his own right, rather than just a consultant.  Cunningham had visited Wade's new office, and soon thereafter, Cunningham asked Wade for $50,000.  Wade immediately provided the money (in a check written to "Coastal Capital"), and then began purchasing expensive antiques and other items for the Congressman.  Cunningham started appropriating money to MZM.  Although Wilkes

---

[6]   In addition to the above, Cunningham secured an additional $6.3 million for the GIDC program for 2002.

07CR0330-LAB

received approximately $12 million through GIDC contracts in 2003 and 2004, these were subcontracts – MZM had become the prime contractor on those contracts.

Even as a subcontractor, however, Wilkes reaped significant profits from the GIDC program. In 2003, Wade and other ADCS, Inc. employees ultimately negotiated a deal by which ADCS, Inc. provided to the government computer storage equipment costing $690,000, but charged the government just under $6 million. While government employees raised some concerns, because this was clearly a Cunningham contract, and Cunningham could jeopardize people's jobs and other important defense appropriations, no one offered any significant resistance.

Wilkes attempted to maintain his position with Cunningham, and in 2003, he gave Cunningham tickets to the Super Bowl in San Diego, a vacation to Key Largo, and, in the summer of 2003, a vacation to Hawaii. In Hawaii, Wilkes paid for Cunningham's accommodations at the luxury Hapuna Suite at the Hapuna Beach Prince Hotel, lavish catered meals, rounds of golf, and diving trips. He also provided Cunningham with two nights with prostitutes for which Wilkes paid $300 per night.

In 2003, Cunningham helped appropriate $16.15 million for the GIDC program for fiscal year 2004. Once again ADCS, Inc. found itself designated the subcontractor to MZM as prime contractor. Nevertheless, ADCS, Inc. made an enormous profit on the GIDC contract, receiving $5.97 million for computer equipment and laptops valued at just over $1 million.

Even though Cunningham had effectively raised his price, bribing Cunningham still made sense economically, so in 2004, Wilkes supplied his largest bribe yet: a $525,000 payment to help Cunningham pay off his second mortgage. To conceal this bribe, Wilkes and Cunningham used the services of defendant Michael, as described below.

All told, Wilkes conveyed to Cunningham over $625,000 in cash bribes, and thousands of dollars more in boats, meals, vacations, electronics equipment, flights, transportation, and other benefits. Through Cunningham's influence, ADCS, Inc. – a company that had no assets or experience in document conversion, other than what Wilkes brought as a lobbyist to a software company – received more than $80 million from government contracts in just eight years.

//

//

B.    THE CASE AGAINST JOHN MICHAEL

Defendant John Michael and his uncle, Thomas Kontogiannis, are professional money launderers.  Cunningham, Wade, and Wilkes utilized their services on several occasions – all in connection with properties Cunningham financed through Coastal Capital Corporation.  Defendant Michael was part owner and president of Coastal Capital, a mortgage company that Michael and Kontogiannis used to perpetrate a $50-100 million bank fraud and money laundering scheme.

Cunningham first utilized Michael's money laundering services in 2001, to conceal the $50,000 bribe from Wade.  Wade agreed to give Cunningham the money, but instead of writing a check to Cunningham directly, he wrote the check payable to Coastal Capital, which then issued a check to Cunningham.  Not long after this, Michael was arranging to provide all of the money Cunningham needed to buy a $350,000 condominium in Arlington, Virginia.  Bank records show that Coastal Capital simply gave to Cunningham $200,000 of this money, wiring it directly from one of Coastal Capital's own bank accounts.  When he testified in front of the grand jury, however, Michael claimed that he could only assume that Cunningham's $200,000 down payment had come from Cunningham's bank accounts.  Coastal Capital provided the balance, $150,000, in the form of a mortgage, which it subsequently sold to a bank.

Two years after his condominium purchase, Cunningham again called upon Michael and Kontogiannis to launder bribe money in relation to a real estate transaction.  This time, Cunningham was purchasing a $2.3 million home in the Rancho Santa Fe neighborhood of San Diego.  Coastal Capital arranged for a $595,000 first mortgage, and a $500,000 second mortgage.  During his grand jury appearance, Michael testified that he structured Cunningham's financing this way because the Cunninghams' combined income did not qualify them for a $1.1 million super-jumbo mortgage.  In reality, however, the evidence will show that Michael structured the Cunninghams' financing this way because he knew that Cunningham was expecting to receive $500,000 that he intended to use to reduce the debt on his house.  The second mortgage stayed on Coastal's warehouse line longer than allowed under the agreement with Coastal's warehouse lender – so much so that records and testimony will establish that, in February 2004, the warehouse lender started withdrawing from Coastal Capital's collateral account about $125,000 each month.  In contrast to his first mortgage, Cunningham did not

11

1  make payments on his second mortgage in any of the first three months of its existence, though on April

2  20th, Cunningham made a single "catch-up" payment to Coastal Capital.

3  As it turns out, Wilkes was to provide $525,000 to pay off Cunningham's second mortgage, but

4  he was so late in doing so that Michael and Kontogiannis had to redirect money from their previously

5  separate bank fraud scheme to reimburse Coastal Capital for effectively paying off Cunningham's

6  second mortgage. In this particular instance, the money came from a fraudulent mortgage issued in the

7  name of the head maintenance man at Kontogiannis's office building, purportedly to purchase real

8  property being sold by a company controlled by Kontogiannis. The subject property did not exist in

9  May 2004 and only recently has construction begun there. Instead of all the proceeds going to

10  Kontogiannis's business, $512,538.75 went to Coastal Capital on May 6, 2004. Of this money,

11  $502,538.75 was used to pay off Cunningham's loan, and the remaining $10,000 was booked as an

12  "application fee," but was in effect a money laundering fee to John Michael.

13  Notwithstanding these machinations, Michael testified before the grand jury that he had talked

14  to Kontogiannis about selling him Cunningham's second mortgage before it had even closed; that

15  Coastal sold Kontogiannis this mortgage in a package of about $3 million worth of loans; and that he

16  had no idea what the status of the second mortgage was or whether Kontogiannis had paid it off.

17  Wilkes eventually came through with his bribe for Cunningham by wiring $525,000 to a

18  Kontogiannis company, Parkview Financial. This transaction, like the check from Wade to Coastal

19  Capital two years earlier, avoided any sort of direct link between Wilkes's money and Cunningham.

20  This money was used to reimburse Kontogiannis for having foregone the fraud proceeds used to

21  reimburse Coastal Capital for paying off Cunningham's second mortgage. Michael knew Kontogiannis

22  would be reimbursed for paying Cunningham's second mortgage with either another fraudulent

23  mortgage or with the $500,000 he knew Cunningham had been waiting for – either way, Michael was

24  expecting an additional transaction involving the proceeds of unlawful activity.

25  //

26  //

27  //

28  //

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III

### LEGAL PRINCIPLES

A.      ELEMENTS OF THE OFFENSES AND LEGAL ISSUES[7/]

     1.      Conspiracy (18 U.S.C. § 371)

Both defendants are charged with conspiracy to commit a number of offenses, including honest services wire fraud, bribery of a public official, money laundering, and unlawful monetary transactions. The elements of a Section 371 conspiracy offense are:

> First, there was an agreement between two or more persons to commit at least one crime as charged in the indictment;
>
> Second, each defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it, and
>
> Third, one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

9th Cir. Model Crim. Jury Instr. 8.16 (2003).  *See also United States v. Hubbard,* 96 F.3d 1223, 1226 (9th Cir. 1996).

Each member of the conspiracy is responsible for the actions of the other conspirators performed during the course and in furtherance of the conspiracy.  9th Cir. Model Crim. Jury Inst. 8.20 ("Conspiracy - *Pinkerton* Charge"); *United States v. Alvarez-Valenzuela,* 231 F.3d 1198, 1202-1203 (9th Cir. 2000); *Pinkerton v. United States,* 328 U.S. 640 (1946).

Statements made by one conspirator to another or to any other person are admissible under Fed. R. Evid. 801(d)(2)(E) so long as the statements were made in furtherance of the conspiracy.  *See United States v. Bridgeforth*, 441 F.3d 864, 869 (9th Cir. 2006); *United States v. Zavala-Serra,* 853 F.2d 1512, 1516 (9th Cir. 1988).  All that is required is a finding that the statement itself, no matter to whom it was made, was made in furtherance of the conspiracy.  *Zavala-Serra*, 853 F.2d at 1516.  Further, in determining whether a statement is in furtherance of a conspiracy, the court looks to the declarant's intent in making the statement, not the actual effect of the statement.  *See United States v. Williams,* 989 F.2d 1061, 1067 (9th Cir. 1993).  Statements made to recruit participants, induce further participation,

---

[7/]      The government will present a full set of annotated jury instructions under separate cover.

prompt further action, allay fears or keep co-conspirators abreast of an ongoing conspiracy's activities are in furtherance of a conspiracy, and accordingly, are admissible under Rule 801(d)(2)(E).

A conspiracy may have multiple objects and a general guilty verdict is sufficient even for a multiple object conspiracy. *See Griffin v. United States,* 502 U.S. 46 (1989).

2.   Honest Services Wire Fraud (18 U.S.C. §§ 1341, 1346)

Ninth Circuit Model Jury Instruction § 8.102 lists the elements of honest services mail fraud as follows:

> First, the defendant made up a scheme or plan to deprive the victim of his/her right to honest services;
>
> Second, the defendant acted with the intent to deprive the victim of his/her right to honest services; and
>
> Third, the defendant used, or caused someone to use, the mails to carry out or to attempt to carry out the scheme or plan.
>
> A mailing is caused when one knows that the mails will be used in the ordinary course of business or when one can reasonably foresee such use. It does not matter whether the material mailed was itself false or deceptive so long as the mail was used as an important part of the scheme, nor does it matter whether the scheme or plan was successful or that any money or property was obtained.

9th Cir. Crim. Jury Instr. 8.102 (2003).

While this is the current model instruction, upon reviewing the recent case law the government has concerns about the instruction's accuracy and completeness. Among other things, the model instruction contains no requirement that defendant have an intent to defraud, or that the scheme to defraud be material. *Compare*, *e.g., United States v. Omer,* 395 F.3d 1087 (9th Cir. 2005) (dismissing indictment charging honest services fraud which failed to allege materiality of the scheme to defraud). The government will submit a revised Honest Services Wire Fraud instruction incorporating the relevant authorities with its complete set of proposed jury instructions.

3.   Bribery of a Public Official (18 U.S.C. § 201(b)(2))

The elements of the offense of bribery as applied to this case are:

> First, the defendant gave, offered, or promised something of value to Randall Cunningham, who was then a public official; and
>
> Second, the defendant acted corruptly, that is, with the intent to influence an official act by Randall Cunningham or to persuade Randall Cunningham to omit to do an act in violation of his lawful duty.

14

1

2

3

> A Member of Congress is a "public official." The term "official act" means any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit.

4

5

6

7

8

9

> The government need not show that the defendant intended for his payments to be tied to specific official acts (or omissions). Further, it is not necessary for the government to prove that the payor intended to induce the official to perform a set number of official acts in return for the payments. The *quid pro quo* requirement is satisfied so long as the evidence shows a course of conduct of favors and gifts flowing to a public official *in exchange for* a pattern of official actions favorable to the donor. Thus, all that must be shown is that payments were made with the intent of securing a specific *type* of official action or favor in return. However, a good will gift to an official to foster a favorable business climate, given simply with the generalized hope or expectation of ultimate benefit on the part of the donor, does not constitute a bribe.

10

9th Cir. Model Crim. Jury Instr. 8.8 ("Bribery of a Public Official") (2003) (modified by the addition

11

of definitions for public official in 18 U.S.C. §201(a)(1) and official act in 18 U.S.C. § 201(a)(c), further

12

modified by language clarifying what the government need and need not prove, under *United States v.*

13

*Quinn*, 359 F.3d 666, 673 (4th Cir. 2004) (government need not "prove 'that the defendant intended for

14

his payments to be tied to specific official acts (or omissions) . . . . Rather, it is sufficient to show that

15

the payor intended for each payment to induce the official to adopt a specific course of action.'")

16

(citation omitted) and *United States v. Jennings,* 160 F.3d 1006, 1014 (4th Cir. 1998) (requisite *quid pro*

17

*quo* for bribery conviction may be shown by course of conduct of favors *"in exchange for* pattern of

18

official actions favorable to the donor") (emphasis in original)).

19

The government official need not have actually taken the official act, as long as the defendant

20

intended the payment to be for the purpose of inducing the act or omission. *See United States v.*

21

*Brewster,* 408 U.S. 501, 526 (1972) ("The illegal conduct is taking or agreeing to take money for a

22

promise to act in a certain way. There is no need for the government to show that appellee fulfilled the

23

alleged illegal bargain; acceptance of the bribe is the violation of the statute, not performance of the

24

illegal promise.") Thus, even if Cunningham ultimately lacked the authority to make the final decision

25

regarding government contracts, or simply declined to do so, neither would be a defense. *See, e.g.,*

26

*Krogmann v. United States*, 225 F.2d 220, 225 (6th Cir. 1955) (section 201 "is applicable to a situation

27

where the advice and recommendation of the Government employee involved would be influential in

28

securing the decision desired by the persons offering the bribe, even though the employee did not have

the authority to make the final decision") (citations omitted).

4.     Money Laundering (18 U.S.C. §§ 1956(a)(1) and 1957(a))

In order to convict a defendant of money laundering under Title 18, United States Code, Section

1956(a)(1)(A)(i) (promotion), the government must establish that:

First, the defendant conducted or attempted to conduct a financial transaction involving property that represents the proceeds of a Specified Unlawful Activity, here, Honest Services Wire Fraud in violation of Title 18, United States Code, Sections 1343 and 1346, and Bribery of a Public Official in Violation of Title 18, United States Code, Section 201(b)(1)(A);

Second, the defendant knew that the property represented the proceeds of some form of unlawful activity; and

Third, the defendant acted with the intent to promote the carrying on of the Specified Unlawful Activity.

18 U.S.C. § 1956(a)(1)(A)(i), (c)(1); 9th Cir. Model Crim. Jury Instr. 8.120.

In order to convict a defendant of money laundering under Title 18, United States Code, Section

1956(a)(1)(B)(i) (concealment), the government must prove that

First, the defendant conducted or intended to conduct a financial transaction involving property that represented the proceeds of a Specified Unlawful Activity, here, Honest Services Wire Fraud in violation of Title 18, United States Code, Sections 1343 and 1346, and Bribery of a Public Official in Violation of Title 18, United States Code, Section 201(b)(1)(A);

Second, the defendant knew that the property represented the proceeds of some form of unlawful activity; and

Third, the defendant knew that the transaction was designed in whole or in part to conceal or disguise the nature, source, ownership, or control of the proceeds of the Specified Unlawful Activity.

18 U.S.C. § 1956(a)(1)(B)(i), (c)(1); 9th Cir. Model Crim. Jury Instr. 8.121.

As to both the concealment and promotion offenses, the term "knowing that the property

involved in a financial transaction represents the proceeds of some form of unlawful activity" means

that the person knew the property involved in the transaction represented proceeds from some form,

though not necessarily which form, of activity that constitutes a felony under State, Federal, or foreign

law.  *See* 18 U.S.C. § 1956(c)(1).  Moreover, to be guilty of Title 18, United States Code, Section 1956,

the defendant must know that the primary predicate crime was unlawful, but he need not know that the

16

secondary act of laundering the proceeds of the underlying activity was unlawful.  9th Cir. Crim. Jury Instr. 8.120 (comment) (2003)(citing *United States v. Deeb,* 175 F.3d 1163, 1167 (9th Cir. 1999)).

"[T]he term 'conducts' includes initiating, concluding, or participating in initiating, or concluding a transaction."  *United States v. Jackson*, 72 F.3d 1370, 1385 (9th Cir. 1995) (citation omitted).  Thus, a defendant conducts a financial transaction when he directs or causes others to carry out the financial transaction (*e.g.,* deposit money).  *See id.. See also, e.g., United States v. Prince*, 214 F.3d 740, 749 (6th Cir. 2000); *United States v. Sneed*, 63 F.3d 381, 388 (5th Cir. 1995).

Finally, the elements of money laundering under Title 18, United States Code, Section 1957 are:

First, the defendant knowingly engaged or attempted to engage in a monetary transaction;

Second, the defendant knew the transaction involved criminally derived property;

Third, the property had a value of greater than $10,000;

Fourth, that the property was, in fact, derived from a Specified Unlawful Activity, here, Honest Services Wire Fraud in violation of Title 18, United States Code, Sections 1343 and 1346, and Bribery of a Public Official in Violation of Title 18, United States Code, Section 201(b)(1)(A); and

Fifth, the transaction occurred in the United States.

The term "monetary transaction" means the deposit, withdrawal, transfer, or exchange, in or affecting interstate commerce, of funds or a monetary instrument by, through, or to a financial institution.

The term "criminally derived property" means any property constituting, or derived from, the proceeds of a criminal offense. The government must prove that the defendant knew that the property involved in the monetary transaction constituted, or was derived from, proceeds obtained by some criminal offense. The government does not have to prove that the defendant knew the precise nature of that criminal offense, or knew the property involved in the transaction represented the proceeds of Honest Services Wire Fraud in violation of Title 18, United States Code, Sections 1343 and 1346, and Bribery of a Public Official in Violation of Title 18, United States Code, Section 201(b)(1)(A).

Although the government must prove that, of the property at issue more than $10,000 was criminally derived, the government does not have to prove that all of the property at issue was criminally derived.

9th Cir. Crim. Jury Instr. 8.123A; 18 U.S.C. § 1957(a).

//

//

//

17

5.     Obstruction of Justice (18 U.S.C. § 1503)

To secure a conviction for obstruction of justice, the government must prove:

First, that there was a proceeding pending before a federal grand jury as described in the indictment; and

Second, that the defendant knowingly and corruptly endeavored to influence, obstruct or impede the due administration of justice in that grand jury proceeding as charged.

To "endeavor" means to strive or to attempt to accomplish a goal or a result; and to endeavor to "influence, obstruct or impede" the due administration of justice means to take some action for the purpose of swaying or changing, or preventing or thwarting in some way any of the actions likely to be taken in the grand jury proceeding involved.

To act "corruptly" means to act knowingly and dishonestly with the specific intent to influence, obstruct or impede the due administration of justice.

While it must be proved that the defendant corruptly endeavored to influence, obstruct or impede the due administration of justice as charged, and that the natural and probable effect of the defendant's acts would be to influence, obstruct or impede the due administration of justice, it is not necessary for the government to prove that the grand jury proceeding was in fact influenced or obstructed or impeded in any way.

18 U.S.C. § 1503; 11th Cir. Model Criminal Jury Instruction 56.1; *United States v. Aguilar*, 515 U.S. 593, 599-600 (1995).

6.     Criminal Forfeiture (18 U.S.C. § 982)

A person convicted of money laundering offenses under Title 18, United States Code, Sections 1956 or 1957, shall forfeit to the United States any property, real or personal, involved in such offense or any property traceable to such property.  18 U.S.C. § 982(a)(1).

The criminal forfeiture statute contained in Title 18, United States Code, Section 982 incorporates the procedures for criminal forfeitures provided in Title 21, United States Code, Section 853.  *United States v. Ripinsky,* 20 F.3d 359, 361 (9th Cir. 1994); 18 U.S.C. § 982(b)(1).

The government need only prove that property should be criminally forfeited by a preponderance of the evidence.  *United States v. Garcia-Guizar,* 160 F.3d 511, 517-18 (9th Cir. 1998) (citing *United States v. Hernandez-Escarsega,* 886 F.2d 1560, 1577 (9th Cir. 1989)); *United States v. Rutgard,* 116 F.3d 1270, 1293 (9th Cir. 1997) (internal citations omitted).  If, upon conviction, the government is unable to reach forfeitable assets, the court may order the defendant to forfeit substitute assets, i.e.

property of the defendant that is not connected to the underlying crime.  *Ripinsky,* 20 F.3d at 362.; 21U.S.C. § 853(p).

## IV

## OTHER TRIAL ISSUES

A.   GOVERNMENT'S MOTION TO DISMISS WITHOUT PREJUDICE COUNTS 23 AND 24 WITH RESPECT TO DEFENDANT MICHAEL ONLY

The government moves to dismiss without prejudice Counts 23 and 24 of the Superseding Indictment with respect to defendant Michael only.

B.   SUMMARY WITNESSES

The government intends to call Defense Criminal Investigative Service Agent Sam Medigovich and Internal Revenue Service Agent Eric Helfand to testify as to the preparation of schedules that summarize voluminous financial documents.  Agent Medigovich will testify about the numerous Military Interdepartmental Purchase Requests ("MIPRs") and transactions connected to the allocation, request, and payment of government funds to ADCS, Inc. by government agencies during the years of the conspiracy.  Agent Helfand will testify about the wire transfers, checks, and other financial transactions that relate to the money laundering part of the case.  Their testimony will be predicated upon documents that are admissible evidence, which have been made available to defense counsel for review and inspection.

1.   Case Law Pertinent to the Use of a Summary Witness

The use of summary witnesses has long been approved by the courts.  *See United States v. Johnson,* 319 U.S. 503, 519-20 (1943) (summary witness testimony admissible in a tax evasion prosecution); *United States v. Baker,* 10 F.3d 1374, 1411 (9th Cir. 1993) ("this circuit has often allowed the use of summary charts and summary witness testimony based on testimonial evidence"), *overruled on other grounds by United States v. Nordby,* 225 F.3d 1053 (9th Cir. 2000); *United States v. Clardy,* 612 F.2d 1139, 1153 (9th Cir. 1980) (court has wide discretion to admit expert testimony); *Kohatsu v. United States,* 351 F.2d 898, 903 n.8 (9th Cir. 1965) (expert accountant may properly summarize voluminous records and interpret and explain evidence within his expert competence).  As the Ninth Circuit has recognized, summary evidence "can help the jury organize and evaluate evidence which is

1   factually complex and fragmentally revealed in the testimony of the multitude of witnesses." *United*

2   *States v. Shipley,* 884 F.2d 1130, 1133 (9th Cir. 1989).

3                    2.   Summary Charts or Schedules of Voluminous Evidence

4        In addition to the testimony of summary witnesses, the government intends to offer through these

5   witnesses several summary schedules of voluminous evidence.  These summaries are admissible under

6   Federal Rule of Evidence 1006, which provides:

> The contents of voluminous writings, recordings, or photographs which cannot
> conveniently be examined in court may be presented in the form of a chart, summary,
> or calculation.  The originals, or duplicates, shall be made available for examination or
> copying, or both, by other parties at reasonable time and place.  The court may order that
> they be produced in court.

10  Fed. R. Evid. 1006.  As the Ninth Circuit has explained, "The purpose of Rule 1006 is to allow the use

11  of summaries when the volume of documents being summarized is so large as to make their use

12  impractical or impossible; summaries may also prove more meaningful to the judge and jury."  *United*

13  *States v. Johnson,* 594 F.2d 1253, 1255 (9th Cir. 1979) (citation omitted).  The proponent of a summary

14  under Rule 1006 must establish the admissibility of the underlying documents in order to introduce the

15  summary.  *See United States v. Meyers,* 847 F.2d 1408, 1411-12 (9th Cir. 1988) (allowing government

16  to admit a summary chart of telephone calls and surveillance logs to explain "confusing" events);

17  *Johnson,* 594 F.2d at 1255.  The proponent must also establish that the underlying documents were made

18  available to the opposing party for inspection.  *See Paddack v. Dave Christensen, Inc.,* 745 F.2d 1254,

19  1259 (9th Cir. 1984).

20       The Ninth Circuit has repeatedly approved the use of Rule 1006 summaries, particularly where,

21  as here, the summaries will aid in organizing the information contained in a large number of documents

22  into understandable form.  *See e.g., Keith v. Volpe,* 858 F.2d 467, 479-80 (9th Cir. 1988) (summaries

23  necessary to clearly present relevant facts in government agency files).

24       C.   DEFENDANTS' STATEMENTS OR THOSE OF THEIR AGENTS

25       The government may offer evidence of the defendants' statements that were made in furtherance

26  of the scheme charged in the indictment and/or were admissions.  Statements not offered for the truth

27  of the matter asserted are not hearsay.  Fed R. Evid. 801(c).  For example, such evidence in this case

28  may be offered for its effect on the listener or as circumstantial evidence of the 's state of mind.  *See*

*United States v. Arteaga,* 117 F.3d 388, 397 (9th Cir. 1997) (such statements are not hearsay).  To the extent the defendants' statements may be offered for the truth of the matter asserted, they are admissible as admissions of a party opponent in furtherance of the scheme to defraud, pursuant to Federal Rules of Evidence 801(d)(2)(A) and 801(d)(2)(E).  Moreover, authorized statements of agents are not hearsay. Fed. R. Evid. 801(d)(2)(C) and 801(d)(2)(D).

It is axiomatic that defendants may not attempt to elicit their own prior statements through the testimony of other witnesses.  Under the Federal Rules of Evidence, such statements do not fall under any definition of non-hearsay or under any hearsay exception.  Thus, the Court should preclude the defendants from presenting "self-serving hearsay" that the government cannot cross-examine.  *See United States v. Ortega,* 203 F.3d 675, 682 (9th Cir. 2000); *United States v. Fernandez,* 839 F.2d 639, 640 (9th Cir. 1988).

Furthermore, a defendant may not rely on the "rule of completeness" codified in Federal Rule of Evidence 106 to admit his own oral statements.  When a writing or recorded statement (or any part thereof) is introduced by a party, Rule 106 allows for the admission by the adverse party of any other part or any other written or recorded statement which ought in fairness to be considered contemporaneously with it.  Application of the rule of completeness is a matter of the trial court's discretion, and a judge may exclude portions of statements – even portions of a defendant's confession – that are irrelevant.  *See United States v. Dorrell,* 758 F.2d 427, 434-35 (9th Cir. 1985).  The rule, however, is expressly limited to writings and recordings, and does not apply to oral conversations. Advisory Committee's Notes on Rule 106; *United States v. Collicott,* 92 F.3d 973, 983 (9th Cir. 1996).

Rule 106 is not a rule of admissibility and does not permit the admission of otherwise inadmissible hearsay.  *See, e.g., Ortega,* 203 F.3d at 682.  To be admissible, the additional statements must serve to correct a misleading impression of a prior admitted statement created by taking that statement out of context.  *Collicott,* 92 F.3d at 983.  In other words, the additional statements must be both relevant to and explanatory of the portion already introduced.  *Dorrell,* 758 F.2d at 434-35.  The defendant cannot otherwise invoke the rule simply to admit his "explanation" or other favorable information.  For example, in *United States v. Burreson,* 643 F.2d 1344, 1349 (9th Cir. 1981), the court

1  upheld the trial court's ruling precluding the defendant from admitting additional portions of his

2  recorded SEC testimony because they were irrelevant and inadmissible hearsay.

3      D.    DEFENDANTS' CHARACTER EVIDENCE SHOULD BE LIMITED TO
            REPUTATION AND OPINION TESTIMONY REGARDING PERTINENT TRAITS

4      Federal Rule of Evidence 404(a) generally controls the admissibility of character evidence.

5  Once it is determined that character evidence is admissible, the form and method of its proof is governed

6  by Federal Rule of Evidence 405.  Rule 404(a) allows the accused to introduce "[e]vidence of pertinent

7  trait of character."  The basic inquiry, therefore, is whether the character trait in question would make

8  any fact "of consequence to the determination" of the case more or less probable than it would have

9  been without evidence of that character trait.  *See* Fed. R. Evid. 401.  In interpreting the permissible

10  scope of character evidence under Rule 404(a), the Ninth Circuit has ruled that presentation of witnesses

11  to testify about a defendant's character for "law abidingness" and honesty is permissible.  *See United*

12  *States v. Diaz,* 961 F.2d 1417, 1419 (9th Cir. 1992) (testimony regarding whether defendant was "prone

13  to criminal activity" permissible, but not whether he was prone to "large-scale drug dealing").

14  Testimony regarding other character traits should not be allowed.  *Cf. United States v. Keiser,* 57 F.3d

15  847, 856 (9th Cir. 1995).

16      Defendants' character witnesses must also be restricted to relating their opinion of the relevant

17  character traits of a defendant or their knowledge of a defendant's reputation as to those traits.  They

18  may not testify to specific instances of good conduct on a defendant's part.  *See* Fed. R. Evid. 405;

19  *Michelson v. United States,* 335 U.S. 469, 477 (1948); *United States v. Hedgcorth,* 873 F.2d 1307,1313

20  (9th Cir. 1989) ("While a defendant may show a character for lawfulness through opinion or reputation

21  testimony, evidence of specific acts is generally inadmissible.") (citations omitted); *United States v.*

22  *Giese,* 597 F.2d 1170, 1190 (9th Cir. 1979) (character witnesses must restrict their direct testimony to

23  appraisals of defendant's reputation).

24      Because a defendant's character witnesses cannot be expected to know the legal limits of their

25  testimony, it is reasonable to require defense counsel to instruct those witnesses in that regard.  In

26  particular, the witnesses should be told to avoid testimony regarding specific good acts/conduct or the

27  absence of bad conduct on the part of the defendant.  Such instructions will prevent the accidental

28  injection of impermissible evidence.

E.      THE GOVERNMENT MAY CROSS-EXAMINE DEFENDANTS' CHARACTER
        WITNESSES REGARDING SPECIFIC INSTANCES OF CONDUCT

Pursuant to Rule 405(a), the government may cross-examine a defendant's character witnesses to determine whether they have heard of or know about specific instances of the defendant's conduct relevant to his character.[8] The Supreme Court's decision in *Michelson,* 335 U.S. 469, continues to be the preeminent authority on character testimony, including the scope of cross-examinations of character witnesses.[9] There, the Supreme Court explained:

> The price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him. The prosecution may pursue the inquiry with contradictory witnesses to show that damaging rumors, whether or not well-grounded, were afloat – for it is not the man that he is, but the name that he has which is put in issue. Another hazard is that his own witness is subject to cross-examination as to the contents and extent of the hearsay on which he bases his conclusions, and he may be required to disclose rumors and reports that are current even if they do not affect his own conclusion. It may test the sufficiency of his knowledge by asking what stories were circulating concerning events, such as one's arrest, about which people normally comment and speculate. Thus, while the law gives a defendant the option to show as a fact that his reputation reflects a life and habit incompatible with commission of the offense charged, it subjects his proof to tests of credibility designed to prevent him from profiting by a mere parade of partisans.

*Id.* at 479.

Thus, Rule 405(a) codified the holding of *Michelson* that character witnesses may be examined about specific instances of a defendant's conduct which are relevant to the character traits in question. A reasonable, good faith basis for asking the question is sufficient to allow the inquiry. *Cummings,* 468 F.2d at 281.

F.      BUSINESS RECORDS

The government intends to offer into evidence numerous business records exhibits. A business record is admissible if accompanied by a declaration of its custodian or other qualified person, certifying that the record: (1) was made at or near the time of the occurrence of the matters set forth by, or from

---

[8]      Rule 405(a) differs from the common law regarding character testimony by allowing testimony by the witness about his personal opinion of the defendant's character. The scope of cross-examination is similarly broadened, so that the prosecution may ask the witness either if he has heard about a specific instance of conduct or if he *knows* about a specific incident. This change was intended to eliminate unnecessary formalization regarding the questions asked on cross-examination. *See* Advisory Committee's Notes on Rule 405(a); *United States v. Scholl,* 166 F.3d 964, 974 (9th Cir. 1999).

[9]      *Michelson* has been modified by Rule 405(a) to allow opinion as well as reputation testimony.

23

07CR0330-LAB

information transmitted by, a person with knowledge of those matters; (2) was kept in the course of the regularly conducted activity; and (3) was made by the regularly conducted activity as a regular practice. Fed. R. Evid. 902(11).

"The phrase 'other qualified witness' is broadly interpreted to require only that the witness understand the record keeping system." *United States v. Ray,* 930 F.2d 1368, 1370 (9th Cir. 1990) (welfare fraud investigator may testify about contents of defendant's welfare file where investigator was familiar with filing and reporting requirements and forms used, even though she did not record information and was not custodian). The qualified witness need not have personally participated in the creation of the document. *Id. See also United States v. Bland,* 961 F.2d 123, 127 (9th Cir. 1992). The use of a computer to create or store business records is not material to the analysis under Rule 803(6): "it is immaterial that the business record is maintained in a computer rather than in company books." *United States v. Catabran,* 836 F.2d 453, 457 (9th Cir. 1988) (quotation omitted). A business record that is incomplete or contains erasures is still admissible. *Bland,* 961 F.2d at 127.

G.   <u>RECIPROCAL DISCOVERY</u>

Defendants have been provided tens of thousands of pages of Bates-numbered discovery and access to all of the discoverable documents in this case.  The government has also agreed to make additional discovery available to the defense if and when it is received by the government.

Other than the box of records identified above provided by defendant John Michael, no further discovery has been provided by the defendants.  As a consequence, the government will move to exclude any defense evidence not produced in reciprocal discovery, including the testimony of the defense experts and any other witnesses for whom a prior recorded statement exists.

1

**V**

2

<u>**WITNESSES**</u>

3

 The government may call the following individuals as witnesses in its case-in-chief at trial, but

4

reserves the right to call additional witnesses during its case-in-chief or in rebuttal:

5

| | |
|---|---|
| Abraham, Rene | Liu, Kitty |
| Anderson, Wayne | McFadden, Tammy |
| Baines, Antonio | McKeon, Robert |
| Barker, Lynn | McLean, Ralph |
| Barnes, Anne | McSwain, Patrick |
| Behrens, Paul | Nixon, Steven |
| Berl, William | Oertel, Sarah |
| Bertman, Chris | Oliver, Dave |
| Borromeo, Arnold | Phillips, John |
| Burr, Brian | Puccinelli, Jeff |
| Campos, Yovani | Reed, Roy |
| Chu, Yao | Roby, Cheryl |
| Collins, Frank | Roper, Kevin |
| Combs, Joel | Rosetta, Donna |
| Condon, Christine | Scheinberg, Martin |
| Cotton, Gail | Scholl, Joan |
| Couillard, Marc | Stenbit, John |
| Cunningham, Randall | Stickle, Bob |
| Deligiannis, Stefan | Todd, Elizabeth |
| Ellington, Sandra | Wade, Mitchell |
| Fabrie, Linda | Weber, Troy |
| Griggs, Powell | Whitehouse, William |
| Guadagnini, Mark | Woodworth, Susan |
| Hardin, Trey | Wysocki, Robert |
| Harrison, Kim | |
| Heil, Dave | |
| Herndon, Karen | Helfand, Eric, IRS Special Agent |
| Hickok, Glen | McBain, Janel, FBI Special Agent |
| Holley, Chris | Medigovich, Sam, DCIS Special Agent |
| Horsfall, Clifford | Siller, Lamont, FBI Special Agent |
| Jones, Gary | |
| Jones, Nancy | |
| Kane, Max | |
| Kang, Anne | |
| Kerley, Randy | |
| Keshishian, Mark | |
| Kontogiannis, Thomas | |
| Kratz, Louis | |
| Lifset, Nancy | |

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

25

The following witnesses are custodians of records:

Burnett, Douglas - Cour d'Alene
Crump, Cara - Wells Fargo
Fenton, Beverly - Diners Club (Citibank)
Hazelwood, Charles - NVA Title
Hill, Marcia - Union Bank
Jenkins, Caren - North Fork Bank
Kratz, Chester - Capitol Title
LuCree, Guy - Netjets
Orozco, Vanessa - Four Seasons Hotel, Las Vegas
Ownby, Erica -  United Bank
Rickson, Terrence - Suntrust Bank
Salas, Linda - American Express Custodian
Stout, Robert - Mauna Kea/Hapuna
Thacker, Andrew - Flexjet
Valleau, Kate - Merril Lynch

DATE: September 27, 2007

Respectfully submitted,

KAREN P. HEWITT
United States Attorney

/s/ Sanjay Bhandari
SANJAY BHANDARI
Assistant U.S. Attorney

/s/ Valerie H. Chu
VALERIE H. CHU
Assistant U.S. Attorney

/s/ Jason A. Forge
JASON A. FORGE
Assistant U.S. Attorney

/s/ Phillip L.B. Halpern
PHILLIP L. B. HALPERN
Assistant U.S. Attorney

07CR0330-LAB

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | Criminal Case No. 07CR0330-LAB |
| ) | |
| Plaintiff, ) | |
| v. ) | CERTIFICATE OF SERVICE |
| ) | |
| BRENT ROGER WILKES (1), ) | |
| JOHN THOMAS MICHAEL (2), ) | |
| ) | |
| Defendants. ) | |
| ) | |

IT IS HEREBY CERTIFIED THAT:

I, Valerie H. Chu, am a citizen of the United States and am at least eighteen years of age. My business address is 880 Front Street, Room 6293, San Diego, California 92101-8893.

I am not a party to the above-entitled action. I have caused service of the GOVERNMENT`S TRIAL MEMORANDUM on the following parties by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

1.     Mark Geragos (Counsel for Defendant Wilkes)

2.     Raymond Granger (Counsel for Defendant Michael)

I hereby certify that I shall cause to be mailed the foregoing, by the United States Postal Service, to the following non-ECF participants on this case:

NONE

the last known address, at which place there is delivery service of mail from the United States Postal Service.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 27, 2007

/s/ Valerie H. Chu
VALERIE H. CHU