# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                            Plaintiff,<br>  vs.<br><br>BRENT ROGER WILKES,<br><br>                            Defendant. | CASE NO. 07cr0330-LAB<br><br>**ORDER DENYING MOTION FOR A NEW TRIAL** |

On November 5, 2007, a jury convicted Brent Wilkes of one count of conspiracy, ten counts of honest-services fraud, one count of money laundering, and one count of bribing a public official. He was sentenced on February 19, 2008 to 12 years in prison. The charges against him arose out of his complicity in the corruption scandal surrounding San Diego Congressman Randall "Duke" Cunningham; specifically, Wilkes was convicted of lavishing Cunningham with money and other benefits in exchange for Cunningham steering defense contracts to Wilkes's business. Now before the Court is Wilkes's motion for a new trial on the basis of newly discovered evidence. Wilkes filed the motion on November 4, 2010, just one day before the deadline set by Rule 33 of the Federal Rules of Criminal Procedure.[1]

---

[1] Wilkes suggests that because his appeal of his conviction is pending, the Court lacks jurisdiction at this time to rule on his motion for a new trial. Actually, Rule 33 allows the Court to rule on a motion for a new trial while an appeal is pending provided it *denies* the motion. On the other hand, "[i]f an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case." Fed. R. Crim. P. 33(b)(1). *See United States*

The new evidence that Wilkes claims to have discovered, and that he argues is exculpatory, is twofold. First, Wilkes submits two declarations recently signed by Cunningham in which Cunningham says Wilkes did not bribe him. Second, Wilkes submits the pleadings from criminal cases against a co-conspirator of Cunningham's, Thomas Kontogiannis, establishing that Kontogiannis orchestrated a massive mortgage fraud scheme. Wilkes also accuses the government of prosecutorial misconduct because of statements it made to the jury in closing argument about the reason Cunningham did not testify against Wilkes, but this accusation folds into Wilkes's argument that Cunningham's recent declarations call his conviction into doubt and necessitate a new trial.

## I. Legal Standard

Rule 33 allows the Court to "vacate any judgment and grant a new trial if the interest of justice so requires." A defendant, like Wilkes, who seeks a new trial on the basis of newly discovered evidence must prove

> (1) the evidence is newly discovered; (2) the defendant was diligent in seeking the evidence; (3) the evidence is material to the issues at trial; (4) the evidence is not (a) cumulative or (b) merely impeaching; and (5) the evidence indicates the defendant would probably be acquitted in a new trial.

*United States v. Hinkson*, 585 F.3d 1247, 1264 (9th Cir. 2009) (en banc) (citing *United States v. Harrington*, 410 F.3d 598, 601 (9th Cir. 2005)). Motions for a new trial should be granted "only in exceptional cases in which the evidence preponderates heavily against the verdict." *United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981).

## II. New Evidence from Cunningham

Much of Wilkes's newly discovered evidence comes from Cunningham himself. Before describing that allegedly new and exculpatory evidence that Wilkes has revieved from Cunningham, some background is in order.

//

---

*v. Cronic*, 466 U.S. 648, 667 n.42 (1984) ("The District Court had jurisdiction to entertain the motion [for a new trial] and either deny the motion on its merits, or certify its intention to grant the motion to the Court of Appeals, which could then entertain a motion to remand the case.").

### A. Cunningham's Offense and Sentence

Cunningham pled guilty to one count of conspiracy and one count of tax evasion on November 28, 2005. (*See United States v. Cunningham*, 5-CR-2137, Doc. No. 4.) His plea agreement, in no uncertain terms, contained admissions that Wilkes bribed him. For example:

> Defendant used his public office and took other official action to pressure and influence United States Department of Defense personnel to award and execute government contracts in a manner that would benefit Coconspirator No. 1 [Wilkes] . . . , which defendant did, in part, because of his receipt of . . . payments and benefits, and not because using [Wilkes] . . . was in the best interest of the country.

(*Id.* at p. 6:19–26.) On March 3, 2006, Cunningham was sentenced to 100 months in prison. (*Cunningham*, Doc. No. 31.) His counsel conceded at sentencing that "Cunningham violated an important public trust," that "his crimes were egregious," that "his conduct warrants severe punishment," and that "he deserves a lengthy prison term." (Cunningham Sentencing Transcript, pp. 13:23–14:1.) Cunningham, for his part, admitted he "made a very wrong turn" and that he "rationalized decisions that I knew were wrong." (Cunningham Sentencing Transcript, p. 51:7–10.) He said, "Repentance will be a lifelong endeavor." (Cunningham Sentencing Transcript, p. 52:12.) He said, "I will spend every day for the rest of my life seeking to atone and seek forgiveness for what I have done to my family, my friends, and the people of San Diego who have trusted me." (Cunningham Sentencing Transcript, p. 54:4–6.) He said, "I have ripped my life to shreds due to my actions, to my actions that I did myself. Not because someone else did it to me. I did it to myself. I made those decisions. I could have said no, and I didn't." (Cunningham Sentencing Transcript, p. 54:7–10.)

In early January 2010, nearly four years after he was sentenced, Cunningham asked the Court to clarify whether his original sentence included the benefit of a downward departure, under Rule 35 of the Federal Rules of Criminal Procedure, for Cunningham's "substantial assistance" to the United States' prosecution of his co-conspirators. (*Cunningham*, Doc. No. 36.) The Court treated the request as a passive demand that the United States file a Rule 35 request on Cunningham's behalf, but noted it lacked authority

to grant relief under the Rule. (*Cunningham*, Doc. No. 41, p. 6. (citing *United States v. Flores*, 559 F.3d 1016, 1019 (9th Cir. 2009) ("Even if a defendant has provided substantial assistance, we may not grant relief unless the government's refusal to file a [d]eparture motion was based on impermissible motives, constituted a breach of a plea agreement, or was not rationally related to a legitimate government purpose.")).) The Court also noted that Cunningham's request was untimely, and that this posed a jurisdictional bar to the Court's consideration of it. (*Cunningham*, Doc. No. 41, p. 6 (citing *United States v. Hetrick*, 627 F.2d 1007, 1010–11 (9th Cir. 1980)).)

Several months after Cunningham asked the Court to shorten his sentence, he wrote another letter to the Court complaining that an IRS lien on his Congressional and military retirement exceeded the restitution obligations imposed by the Court as part of his criminal judgment. (*Cunningham*, Doc. No. 46.) As a postscript to the letter, the merits of which are not relevant here, Cunningham wrote:

> You may not know that both Jason Forge and Phil Halprin lied about not using me in the Wilkes case. I had been coached for two months by them and the Justice Department. I was told that I would be used in the summation of the case and I was positioned outside of the courtroom ready to testify until you ruled that no one could testify that was not used during the trial. They lied to the jury, to you, and to the press.

The Court responded by letter to Cunningham, explaining that the money taken from his retirement accounts pertained to his outstanding tax liability, purely a matter between the IRS and him. (*Cunningham*, Doc. No. 44.) The Court subsequently denied, in February 2011, a request from Cunningham for a "post-conviction accounting" of "federal income taxes, penalties and interest as determined by [the] IRS on February 12, 2007." (*Cunningham*, Doc. No. 49.)

### B.   "Newly Discovered Evidence"

Wilkes's counsel were furnished with copies of Cunningham's request for a clarification of his sentence and his letter to the Court complaining about the IRS liens. Counsel subsequently reached out to Cunningham in the hope that he would provide information that would aid Wilkes's request for a new trial. On October 27, 2010,

Cunningham signed a declaration in which he denied, repeatedly, that Wilkes bribed him. (Cunningham Decl. ¶¶ 8, 17, 18, 25, 26, 31, 33, 35.) He also maintains, consistent with his postscript to his letter to the Court, that it was the government's full intention to call him as a witness against Wilkes, and that he was prepared — and his potential testimony sculpted — extensively. (Cunningham Decl. ¶¶ 8, 9, 10, 12, 15, 28.). Wilkes argues that Cunningham's declaration, a supplemental declaration he signed on November 3, 2010, and Cunningham's post-sentence motions and letters to the Court constitute "newly discovered evidence" that necessitates a new trial. He also submits court records proving that Thomas Kontogiannis was involved in a massive fraud scheme, and he argues that they support his defense that Kontogiannis "used Cunningham to solicit investors and then defrauded them." (Mot. at p. 2.)

**C.   Discussion**

Wilkes's "newly discovered evidence" is, to put it lightly, underwhelming.

The Court accepts Cunningham's representation that the United States prepared him to testify against Wilkes. Wilkes seizes on this fact because, in his closing argument to the jury, Assistant United States Attorney Jason Forge said, "We're not going to put the most corrupt politician on the witness stand and give him a chance to get a break in his sentence . . . . We're not going to do that. We don't need to do that." If in fact Cunningham was outside the courtroom, waiting to take the stand, Forge's argument may have arguably been a little misleading. But this is not *evidence* that exculpates Wilkes within the meaning of Rule 35. To the contrary, it pertains only to the government's prosecutorial designs, which are wholly outside the evidence that the jury relied upon to convict Wilkes.[2] The fact is that Wilkes was always free to call Cunningham as a witness, and despite his attorney's promise to do so, he didn't. The government's ultimate refusal to call Cunningham in no conceivable way prevented Wilkes from soliciting exculpatory testimony from him, if any existed, and

---

[2] In fact, the government's professed explanation for not calling Cunningham as a witness is easy to believe: the government didn't need his testimony to convict Wilkes, and it had sincere concerns that if he did testify, he would do so dishonestly or in a manner that overshadowed the other evidence in the case. (Forge Decl. Ex. 1, p. 2.)

presenting it to the jury. Even if the Court were to treat as evidence Cunningham's representation that he was prepared by the government to testify against Wilkes, Wilkes has not explained how, on this basis of this evidence, he "would probably be acquitted in a new trial." *Hinkson*, 585 F.3d at 1264. Wilkes's request for a new trial on the ground that Forge allegedly misrepresented the government's reason for not calling Cunningham at trial is **DENIED**; the argument is a total miss.

The Court must also consider Cunningham's recent declarations and his testimony that Wilkes never bribed him. The testimony isn't nearly as effective as Wilkes needs it to be. First, as the government points out, it's arguable that as a matter of law the declarations don't even qualify as "newly discovered evidence" in the first place.[3] *See United States v. Reyes-Alvarado*, 963 F.2d 1184, 1188 ("The Ninth Circuit has adopted the view that when a defendant who has chosen not to testify subsequently comes forward to offer testimony exculpating a codefendant, the evidence is not newly discovered.") (internal quotations and citations omitted); *Herrera v. Collins*, 506 U.S. 390, 417 (1993) ("In the new trial context, motions based solely upon affidavits are disfavored because the affiants' statements are obtained without the benefit of cross-examination and an opportunity to make credibility determinations.") The second problem is that Cunningham simply isn't believable. Not only do his own crimes strip him of credibility in the eyes of the Court, but his declaration statements flatly contradict the substance of his plea agreement, statements he made at the plea hearing, the overwhelming evidence that led to his and Wilkes's conviction, the sworn testimony of federal agents who investigated Cunningham's corruption, and even statements made by Cunningham's own lawyers.

---

[3] The Court also questions whether Cunningham's current testimony is "newly discovered" *as a matter of fact*. In his opening statement to the jury, counsel for Wilkes read from a letter Cunningham wrote from prison in which he said "Wade, not Wilkes, has destroyed a lot of people. 90 percent of what happened is Wade . . . . Wade is the absolute devil." (Forge Decl. Ex. 6, p. 1.) The government also made available to Wilkes, before trial, a letter Cunningham sent his friend Wayne Winters in which he said, "Sorry for the bad decisions I made – not all of what the press claimed was true or what I had to plead to – But had to take the whole plea or nothing." (Forge Decl. Ex. 5, p. 1.) Thus, long before Cunningham executed the present declarations, he'd made statements, available to Wilkes, to the effect that Wilkes's responsibility was minimal and that Cunningham's plea agreement overstated his culpability.

For example, Cunningham states in his declaration that "Mr. Wilkes's payment of $525,000 to Tommy Kontogiannis . . . did not go to pay my mortgage . . . . This money was not a bribe to me." (Cunningham Decl. ¶ 31.) But in a letter that Cunningham's lawyers wrote to the government on February 12, 2007 summarizing Cunningham's "substantial assistance," they noted,

> For example, Mr. Cunningham related the details of various private conversations that he had with Mr. Wilkes and Mr. Kontogiannis regarding the reason for the bribe paid by Mr. Wilkes through Mr. Kontogiannis in May 2004 to satisfy Mr. Cunningham's second mortgage and how Mr. Kontogiannis proposed to hide the bribe through a sophisticated money laundering operation.

(Forge Decl. Ex. 10, p. 2.) Cunningham also admitted during his plea hearing that Wilkes paid off his mortgage. (Plea Tr. at 31:1–32:24.) After prosecutor Forge described the payoff scheme in some detail, the Court asked Cunningham if Mr. Forge's account was accurate and he responded, "Yes, your honor." Finally, a report compiled by FBI Special Agent Maurice Hattier flatly contradicts Cunningham's current testimony that Wilkes' payment of $525,000 to Kontogiannis didn't go to pay his mortgage and wasn't a bribe:

> Cunningham advised that the financing for his purchase of the [Rancho Santa Fe] home in 12/2003 was purposely arranged in such a way . . . because he was expecting $500,000 from Wilkes to help cover one of the mortgages . . . . Cunningham said that, through their discussions, Wilkes understood that the $500,000 payment would buy Cunningham's continued assistance on behalf of ADCS . . . . Cunningham stated that it was discussed between himself and Wilkes that the $500,000 was not to go directly to him (Cunningham), but rather should be sent by Wilkes directly to Tommy Kontogiannis. Cunningham said that this was done in an attempt to conceal the bribe payment. Cunningham and Wilkes had agreed that, if the payment was ever questioned, Wilkes was to assert that he had sent the money as an investment into one of Kontogiannis' Russian business ventures.

(Forge Decl. Ex. 8, p. 2.) Cunningham also says in his declaration that "I didn't request or have sex with any prostitute in Hawaii" and that "there were prostitutes available in Hawaii but . . . I didn't know who hired them or who was to pay them and I didn't know if Brent Wilkes used or left with any prostitute." (Cunningham Decl. ¶ 27.) Yet again, Agent Hattier's report tells otherwise:

> Cunningham was asked whether the services of a prostitute had ever been purchased for him by Brent Wilkes, Mitch Wade or anyone else. In response, Cunningham said that Wilkes had provided him with a prostitute on two separate nights while they were vacationing on the Big Island of Hawaii . . . . Cunningham stated that two prostitutes came out to the suite on the first night, one for him and one for Wilkes. Cunningham was unaware of whether Wilkes, or one of Wilkes' employees, made the arrangements for the prostitutes. After the prostitutes arrived, Cunningham and Wilkes went up to separate bedrooms with their respective prostitutes . . . . Cunningham had sex with his prostitute on this first night. Cunningham said he wore a condom because he wanted to be protected. According to Cunningham, he was somewhat embarrassed on this occasion because he had some difficulty in completing intercourse.

(Forge Decl. Ex. 8, p. 3–4.) Cunningham attempts to neutralize Agent Hattier's report by repeatedly asserting in his declaration that to the extent his statements are contradicted by government reports, the reports are inaccurate. (Cunningham Decl. ¶¶ 18, 19, 27.) In the Court's view, this is a sign of Cunningham's desperation, not veracity, and goes to show how little credibility he has with the Court. Cunningham's measly credibility, together with the fact that the substance of his declaration is contradicted by a mountain of reliable evidence (only a small sample of which is referenced above), leads the Court to firmly doubt that Cunningham's current testimony would "probably" lead to an acquittal if Wilkes were granted a new trial. *Hinkson*, 585 F.3d at 1264. The motion for a new trial is therefore **DENIED** on the basis of Cunningham's recent declarations.

### III.    Evidence of Kontogiannis's Fraud

As "newly discovered evidence" of Kontogiannis's fraud, Wilkes brings to the Court's attention three cases from the Eastern District of New York in which that fraud was exposed and prosecuted. The first, *DLJ Mortgage Capital, Inc. v. Kontogiannis*, was filed in 2008. The second, *United States v. Kontogiannis*, was filed in 2009. The third, *Rothberg v. Chloe Foods Corporation d/b/a Blue Ridge Farms, Inc.*, was filed in 2006.

Wilkes's motion doesn't do an exemplary job of explaining how evidence of Kontogiannis's mortgage fraud scheme is "new" or how, assuming it is, it exonerates Wilkes. (Mot. at p. 15.) Presumably, the argument as to the latter is that any money Wilkes directed to Kontogiannis was, in Wilkes's mind, money to be invested, and was never intended to pay

off Cunningham's mortgage in exchange for political favors. (*See* Cunningham Supp. Decl. ¶¶ 2–6.) The problem is that the *fact* of Kontogiannis's fraud scheme says nothing about Wilkes's *knowledge* of it. Just because Kontogiannis defrauded many people does not mean he defrauded Wilkes, and there is no evidence that he did. To the contrary, it is entirely consistent with Kontogiannis's criminal prosecution that one of his many legal misdeeds was to launder money from Wilkes for the purpose of bribing Cunningham, and the recital of facts in Kontogiannis's plea agreement unambiguously implicates Wilkes:

> In or about May 2004, Cunningham told defendant that his 'partner would be sending him $500,000 to pay off the second mortgage. Defendant informed Cunningham that he should have his 'partner' send $525,000 to cover all of the expenses associated with paying off the mortgage. He also told Cunningham to have his 'partner' contact Parkview Financial to get the information on how to wire the funds. On or about May 12, 2004, Cunningham's 'partner' (Brent Wilkes) transferred $525,000 by wire from San Diego to the New York bank account of Parkview Financial (another entity controlled by defendant) in order to cover the earlier payoff of Cunningham's second mortgage by the defendant.

(Forge Decl. Ex. 14, p. 5.) Wilkes cannot possibly take the position now that Kontogiannis's fraud is news to him. This plea agreement was executed in February 2007 and unsealed on June 11, 2007, well in advance of Wilkes's trial; the government even brought the plea agreement to the attention of Wilkes's lawyer at that time. (Forge Decl. Ex. 15.) Similarly, Wilkes's co-defendant filed a motion on August 16, 2007, also in advance of Wilkes's trial, in which he noted, "It is apparent from discovery, including extensive documentation and grand-jury testimony, that the government is well aware of Kontogiannis not only having engaged in massive mortgage fraud and tax evasion in violation of numerous federal and state statutes, but that he continues to do so." (Doc. No. 70, pp. 9–10.) Counsel for Mr. Wilkes even *invited* the government to introduce evidence of Kontogiannis's fraud at trial. (Forge Decl. ¶ 18.)

Wilkes was therefore well aware of Kontogiannis's mortgage fraud before the allegedly "newly discovered" evidence came to his attention, and he was free to argue at his trial that he was a victim of that fraud rather than a participant in it. He did just that, in fact, and the jury still convicted him. (*See* Forge Decl. Ex. 6, pp. 3–4.) The "newly discovered" evidence

of Kontogiannis's mortgage fraud scheme — the same scheme that was uncovered in the Southern District of California and of which Wilkes had sufficient notice to incorporate into his defense — is no basis for offering him another try at establishing his innocence.[4]

## IV.  Conclusion

The two most important showings Wilkes must make in order to obtain a new trial are that he has discovered new evidence *and* that this evidence would probably lead to an acquittal.  *Hinkson*, 585 F.3d at 1264.  The Court finds Wilkes's motion, however, to be meritless.  The evidence he brings to bear — Cunningham's declarations and proof of the Kontogiannis fraud — was available to him at the time of trial, and, in any event, the Court is extremely confident that it does not in any way establish a probability of acquitting him.  Wilkes's motion for a new trial is therefore **DENIED**.

DATED: March 7, 2011

*Larry A. Burns*

**HONORABLE LARRY ALAN BURNS**
United States District Judge

---

[4] As supplemental evidence to his motion, Wilkes filed a transcript from his sentencing hearing recording the following statement of prosecutor Forge:

> "There is no indication that Thomas Kontogiannis engaged in a fraud scheme against individual investors along the lines of the type of argument that Mr. Geragos was making at trial and is making now.  There's no question he's involved in wide-ranging fraud.  It's bank fraud.  That's been well documented.  And all of these allegations were available to Mr. Geragos well in advance of trial.  And as your honor was pointing out, none of them lead to a defense of Mr. Wilkes.  The fact that Mr. Kontogiannis was defrauding banks of tens of millions of dollars bears no resemblance whatsoever to the argument that Mr. Geragos wanted to make with respect to an individual wire transfer that Mr. Wilkes sent to Mr. Kontogiannis."

(Doc. No. 409.)  If the Court understands Wilkes, what he is attempting to show here is that even if he had general knowledge that Kontogiannis was behind a massive fraud scheme, he did not know this scheme prayed on individual investors, which is what the cases from the Eastern District of New York confirm.  This leaves open the possibility that Wilkes actually was duped by Kontogiannis and did not knowingly wire him $500,000 for the purpose of paying off Cunningham's mortgage.  The Court rejects this argument.  There is ample evidence that Wilkes knew enough of Kontogiannis's fraud to raise it in his defense, and there is ample evidence, anyway, that Wilkes was a knowing participant in the fraud for the purpose of bribing Cunningham.