UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　　　Plaintiff,<br><br>v.<br><br>BRENT ROGER WILKES,<br><br>　　　　　　　　　Defendant. | Case No.: 07cr0330-LAB and 15cv2841-LAB<br><br>**ORDER DENYING MOTION UNDER 28 U.S.C. § 2255** |

Petitioner Brent Roger Wilkes has brought multiple challenges to his convictions for bribery, wire fraud, conspiracy, and money laundering. He filed two fully-briefed motions for a new trial (Docket nos. 204, and 398), a motion for reconsideration of denial of the second motion (Docket no. 409), and two appeals: *United States v. Wilkes*, 662 F.3d 524, 543 (9th Cir. 2011) ("*Wilkes I*"); and *United States v. Wilkes*, 744 F.3d 1101 (9th Cir. 2014) (*Wilkes II*). All previous motions were denied, and Wilkes' conviction was affirmed by the Ninth Circuit.

He then filed a motion to vacate his conviction, under 28 U.S.C. § 2255. (Docket no. 490.) He supplemented this with numerous other briefs, and other motions. In all, he raised fifteen claims in his § 2255 motion.

1

The Court denied twelve of those claims in an order issued December 12, 2017. (Docket no. 535.) The remaining three claims[1] all relate to allegations of ineffective assistance by Wilkes' trial counsel, Mark Geragos.

Wilkes makes various sweeping and inconsistent allegations about Geragos' performance in his motion, and has submitted his own conclusory declaration. (Docket no. 490.) According to Wilkes, Geragos repeatedly admitted being ineffective and blundering. (*See, e.g., id.* at 30–31, ¶¶ 2–4.) But what Wilkes describes as "admissions" are actually not admissions of any professional errors by Geragos. Rather, Geragos points to the Court's rulings and the government's alleged misbehavior as reasons why his performance was hampered. (*See id.*) The only "errors" Geragos confesses to are, according to Geragos, errors made by the Court and the government.

For example, Wilkes accuses the government of wrongly keeping a vast amount of evidence secret and turning it over late. (*Id.* at 30, ¶ 3.) Wilkes then accuses Geragos of committing a "blunder" and a "short-coming" by failing to anticipate that this would happen. (*Id.*) These are not unprofessional errors. Wilkes also repeatedly accused Geragos of doing little or nothing to prepare the case for trial, only to describe a few lines later Geragos' diligent work and their many discussions of the case. (*See, e.g.*, *id.* at 31–32, ¶¶ 5–8 (declaring that Geragos failed to discuss the case with Wilkes, then describing numerous discussions between Geragos and Wilkes).)

Because Wilkes' charges against Geragos waived the attorney-client privilege and relieved Geragos of the professional obligation of confidentiality, the Court ordered Geragos to file a declaration in response to Wilkes' allegations. He did that (Docket no. 536), essentially denying all of them. The Court also required Wilkes to proffer evidence he would present at an evidentiary hearing, if one were held, and required that his filing be

---

[1] These are claims One, Eight, and Fourteen. (*See* Docket no. 535 at 6:11–9:14 (summarizing claims and identifying where they were raised).) The Court's December 12 order limited the scope of these claims, explaining why certain portions lacked merit.

supported by a declaration. (Docket no. 538.) The Court subsequently extended the time to respond, at Wilkes' request. After Wilkes filed a defective response with no declaration (Docket no. 542), the Court cautioned him about the inadequacy of his response and extended the time limit again. (Docket no. 543.) He then filed another document, this time a declaration. (Docket no. 545.) The Court accepted it and construed it together with Wilkes' other filings as constituting his proffer and a response to Geragos' declaration. (Docket no. 546.) The Court also denied Wilkes' renewed discovery requests. (*Id.*) Wilkes filed a motion asking the Court to clarify the denial order, which has been ruled on by separately by the Court. The government also filed its opposition to Wilkes' § 2255 motion. (Docket no. 547.)

Having given Wilkes a full opportunity to address the remaining three claims, and having thoroughly reviewed the briefing Wilkes and the government submitted, the Court now rules on Wilkes' remaining claims.

The Court's order of December 12, 2017 (Docket no. 535) addressed most of Wilkes' claims comprehensively, discussing the procedural history, evidence, and legal standards. Even though that order did not decide Wilkes' claims that Geragos provided ineffective assistance, it analyzed those claims at length. The Court incorporates by reference the facts and reasoning of its December 12, 2017 order into this one. Some facts are repeated here for purposes of clarity.

**Procedural Requirements**

To be entitled to a hearing, a defendant must allege specific facts which, if true, would entitle him to relief. *United States v. McMullen*, 98 F.3d 1155, 1159 (9th Cir. 1996). No hearing is required in order to examine vague or conclusory allegations. *Blackledge v. Allison*, 431 U.S. 63, 72–73 (1977); *United States v. Johnson*, 988 F.2d 941, 945 (9th Cir. 1993).

Likewise, under 28 U.S.C. § 2255(b), if the records and files and the motion itself conclusively show that the prisoner is not entitled to relief, no hearing is required. For purposes of this provision, records include the Court's own knowledge and recollections

3

of the case. *See Blackledge*, 431 U.S. at 74 n.4; *Shah v. United States*, 878 F.2d 1156, 1160 (9th Cir. 1989). The Court can, of course, rely on its own common sense. *Id.* at 1159 (citing *Machibroda*, 368 U.S. at 495). The Court can also expand the record, which may obviate the need for an evidentiary hearing. *See Blackledge*, 431 U.S. at 81–82; *Watts v. United States*, 841 F.2d 275, 277 (9th Cir. 1988).

Although credibility is ordinarily judged at an evidentiary hearing, *Blackledge*, 431 U.S. at 82 n.25, it can sometimes be decided conclusively on the basis of documentary testimony and the record. *Watts*, 841 F.2d at 277. In appropriate circumstances, a court can fully investigate facts outside the record without requiring the prisoner's personal presence at a hearing. *Id.* (citing *Machibroda*, 368 U.S. at 495). The rule's hearing requirement is satisfied so long as the claims are given "careful consideration and plenary processing, including full opportunity for presentation of the relevant facts." *Id.* (citing *Blackledge*, 431 U.S. at 82–83.)

Having reviewed the complete record in this case, including the supplemental filings, and relying on the Court's own clear recollections of the case, it is apparent that an evidentiary hearing is not necessary to determine Wilkes' credibility or the credibility of any of the witnesses. *See Blackledge*, 431 U.S. at 82 n.25. And no other factor renders Wilkes' personal participation in an evidentiary hearing necessary. Wilkes' request for a hearing is **DENIED**.

**Nature of Wilkes' Remaining Claims**

Wilkes' three remaining claims arise from alleged ineffective assistance of his trial counsel, Mark Geragos. The standard for ineffectiveness of trial counsel is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and it is "most deferential" to counsel's representation. *Harrington v. Richter*, 562 U.S. 86, 105 (2011). The Court's order of December 12, 2017 assessed Geragos' effectiveness at trial, and found that he did an unusually good job defending Wilkes. This assessment was based on the Court's records and the Court's own recollection of the trial, which, as mentioned above, is permitted. *Blackledge*, 431 U.S. at 74 n.4; *Shah*, 878 F.2d at 1160. The Ninth Circuit also previously

concluded that Wilkes was not prejudiced by Geragos' level of preparation or his alleged failure to locate evidence. *United States v. Wilkes*, 662 F.3d 524, 543 (9th Cir. 2011).

The only basis on which Geragos might have been ineffective was behind the scenes, in advising Wilkes and preparing for trial. Wilkes' three claims can be summarized as follows:

**Claim 1**

Geragos failed to prepare adequately for trial, failed to review available discovery, failed to discuss events with Wilkes to find out his version of the facts, and failed to conduct a proper pretrial investigation.

**Claim 8**

Geragos failed to interview any of the defense witnesses that Wilkes identified, forcing Wilkes to testify. Additionally, Geragos failed to warn Wilkes of the dangers of testifying and failed to prepare him effectively to testify. Geragos also prevented other attorneys from preparing him to testify.

**Claim 14**

Geragos was ineffective for failing to advise him about entering into a plea agreement. Geragos never discussed the strength of the government's case against him, never made him aware of any benefits of a plea agreement, and failed to advise him of plea offers the government may have made.

Wilkes supported his claims in part with a declaration from Shereen Charlick of Federal Defenders of San Diego, who assisted while Geragos was still representing Wilkes, and whom the Court provisionally appointed (along with attorney Reuben Cahn) to review certain classified documents on Geragos' behalf. (*See* Docket no. 89.) Federal Defenders also represented Wilkes in connection with two post-trial requests for a new trial (Docket nos. 398 (new trial motion) and 411 (motion for reconsideration of denial of motion for new trial)) and on appeal.

The Court ordered Wilkes to proffer whatever evidence he intended to offer at an evidentiary hearing, if one were to be held.

5

07cr0330-LAB and
15cv2841-LAB

**Standard for Ineffective Assistance Claims**

A § 2255 motion ordinarily cannot be used to raise claims that could have been raised on appeal. *See United States v. Frady*, 456 U.S. 152, 164–65 (1982) (holding that a § 2255 motion is not a substitute for a direct appeal). *See also United States v. Berry*, 624 F.3d 1031, 1038 (9th Cir. 2010) (holding that a § 2255 motion cannot be used as a second appeal). Furthermore, any claims or issues that were raised and adjudicated on appeal are law of the case, and are binding on this Court. *See United States v. Hayes*, 231 F.3d 1132, 1139 (9th Cir. 2000).

Ineffective assistance of trial counsel claims, however, can be raised either on direct appeal or by a § 2255 motion. While a claim of ineffective assistance of trial counsel can be raised on direct appeal, a prisoner need not do so to preserve it. *Massaro v. United States*, 538 U.S. 500, 509 (2003). That exception, however, does not broadly encompass every claim that involves counsel's performance. For example, this exception cannot be used as a back door to challenge any of the Court's rulings that had some effect on counsel's performance; those are properly challenged on direct appeal. *United States v. Gonzalez-Rincon*, 36 F.3d 859, 865–66 (9th Cir. 1994) (reviewing for abuse of discretion a claim that the district court's denial of a continuance prevented defense counsel from obtaining exculpatory evidence). Furthermore, because Wilkes actually did challenge the Court's denial of a continuance on direct appeal, he cannot challenge it again now. *See Currie*, 589 F.2d at 995, *Hayes*, 231 F.3d at 1139.

Sixth Amendment claims of ineffective assistance of counsel in federal court are analyzed under the *Strickland* standard. *See United States v. Perry*, 857 F.2d 1346, 1349 (9th Cir. 1988) (applying *Strickland* standard to § 2255 claim). In order to prevail, Wilkes must show (1) deficient performance—Geragos' representation fell below the objective standard for reasonableness; and (2) prejudice — there is a reasonable probability that, but for Geragos' unprofessional errors, the result of the proceeding would have been different. *See id*. at 687–88. The deficiency must be "so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id*. at 687.

The Court's assessment of counsel's advocacy choices and strategies is highly deferential, and, the Court evaluates it in light of what counsel knew at the time. The Supreme Court has repeatedly reminded courts not to evaluate counsel's effectiveness retrospectively, with the benefit of hindsight. *Strickland*, 466 U.S. at 689. Moreover, the standard is an objective one. *Harrington*, 562 U.S. at 109. The standard "calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Id.* at 110. In other words, the Court examines whether counsel's actions were objectively reasonable, not what he was thinking or feeling at the time. *See Strickland* at 699 (the fact that counsel "felt hopeless about [the defendant's] prospects" did not result in ineffective assistance, because his strategy and decision not to seek more evidence were reasonable). Similarly, counsel's own subjective assessment of his performance with the benefit of hindsight is not persuasive. "After an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome." *Harrington*, 562 U.S. at 109.

Additionally, the Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." *Id*. at 689. *See also Cullen v. Pinholster*, 563 U.S. 170, 196 (2011) (noting the "strong presumption of competence" on the part of counsel). The fact that a "wide range" exists means that a defendant cannot prevail merely by showing that his attorney's performance "deviated from best practices or most common custom[.]" *Harrington*, 562 U.S. at 105. Even "demonstrable errors" do not establish ineffective assistance. *United States v. Cronic*, 466 U.S. 648, 657 (1984). Rather, a petitioner must show that his attorney's representation amounted to incompetence under prevailing professional norms. *Strickland*, 466 U.S. at 690. The errors must have been so serious that the attorney was no longer serving in any meaningful sense as the defendant's counsel. Id. at 687. They must also have been "so serious as to deprive the defendant of a fair trial . . . ." *Id*.

*Strickland* does not require optimal representation; all that is required to satisfy the Sixth Amendment is a "reasonably competent attorney." *Harrington*, 562 U.S. at 110. The standard makes room for reasonable miscalculations and lack of foresight. *Id.* The standard also takes into account that attorneys have limited time and resources, and permits attorneys to focus on some matters while avoiding others. *Id.* at 107 (holding that attorneys are entitled to "balance limited resources in accord with effective trial tactics and strategies"). *See also Rompilla v. Beard*, 545 U.S. 374, 383 (2005) (holding that reasonably diligent defense counsel need not exhaust every avenue of investigation).

To show prejudice, Wilkes must show a "reasonable probability" that, but for Geragos' unprofessional errors, he would have been acquitted. *See id.* at 694. A "reasonable probability" is one that is "sufficient to undermine confidence in the outcome" of the trial. *See id.* The likelihood of an acquittal, however, must be "substantial, not just conceivable." *Richter*, 562 U.S. at 112. In this context, "substantial" is similar, though not identical, to the familiar preponderance of the evidence standard. *Id.* (quoting *Strickland*, 466 U.S. at 693) (noting that the difference is "slight" and matters "only in the rarest case").

In light of Wilkes' claims and the Ninth Circuit's rulings, it is worth taking note of what does <u>not</u> amount to ineffective assistance. On direct appeal, Wilkes could, and did, challenge the Court's case management decisions. These challenges were unsuccessful. *See, e.g., Wilkes I*, 662 F.3d at 543 (9th Cir. 2011) (holding that this Court did not abuse its discretion by denying Geragos' request for a continuance, and furthermore that Wilkes was not prejudiced by the denial). Wilkes cannot raise the same claim again in this motion, even if he states it in different terms. *United States v. Currie*, 589 F.2d 993, 995 (9th Cir. 1979) (citing *Sanders v. United States*, 373 U.S. 1, 16 (1963)). An attorney's unprofessional errors in failing to anticipate or respond to a court's order might, of course, amount to ineffective assistance of counsel. But it is only Geragos' alleged errors that are at issue here, not the Court's.

///

Limitations on preparation time do not give rise to an ineffective assistance claim merely because they make counsel's work more difficult. *Morris v. Slappy*, 461 U.S. 1, 11 (1983) ("Not every restriction on counsel's time or opportunity to investigate or to consult with his client or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel."). "The fact that the accused can attribute a deficiency in his representation to a source external to trial counsel does not make it any more or less likely that he received the type of trial envisioned by the Sixth Amendment, nor does it justify reversal of his conviction absent an actual effect on the trial process or the likelihood of such an effect." *Cronic*, 466 U.S. at 62 n.31. This is not to say external constraints, however onerous or unreasonable, can never render an attorney ineffective; clearly, they can. *See Cronic* at 62 n.31; *Morris* at 11–12. But attorneys regularly face some unwanted constraints, and nevertheless represent their clients competently. The fact that Geragos could not spend as much time in preparation as he wished merely puts him in the same position as most other defense attorneys.

**Whether an Evidentiary Hearing is Necessary**

After Geragos filed his declaration, the Court issued an order explaining that, if the declaration were accepted as true, it was clear Geragos was not ineffective within the meaning of *Strickland*. (Docket no. 538 (order of January 8, 2018).) The Court ordered Wilkes to file a response. He was required to proffer evidence—that is, to show what evidence, including his own testimony, that he would present at an evidentiary hearing on his three remaining claims, if such a hearing were held. The Court explained that this evidence could not consist merely of allegations or speculation, but had to be the kind of evidence that would be admissible and could be relied on. (*See id.* at 2:16–4:4.) The Court made clear that any exhibits had to be authenticated, and explained how this was to be done. (*Id.* at 3 n.1.) If Wilkes had no more evidence than was already in the record, there would be no need for a hearing. *See Shah*, 878 F.2d at 1160 (a court's expansion of the record in a § 2255 proceeding by receiving supplemental affidavits and other evidence can address any unanswered questions, obviating the need for a hearing).

9

Wilkes was cautioned that his response to Geragos' declaration needed to be complete in itself, and that the Court would not be looking through documents he had filed in the past in order to piece together arguments for him. (*Id.* at 4:1–2.) The Court reminded him of these requirements twice. (*See* Docket nos. 541 (clarifying the required content of Wilkes' declaration and reminding Wilkes to review the January 8 order); 543 (pointing out that Wilkes had filed a lengthy brief with no declaration or authenticated exhibits, and reminding Wilkes of earlier orders)). When Wilkes failed to file an acceptable response, the Court explained what was wrong with his filing and give him more time. (*See* Docket no. 543.)

The Court's orders, among other things, explained to Wilkes that if an evidentiary hearing were held, he would need to present evidence, and that his response to Geragos' declaration needed to include evidence in the form of a declaration and (if he wished) authenticated exhibits. The Court also explained to Wilkes that his declaration needed to explain the significance of any exhibits that he attached.

Wilkes' first filing (Docket no. 542) consisted of a 259-page brief with many unauthenticated exhibits attached, and no declaration. It acknowledged he was supposed to submit a declaration and promised to do so. His second filing (Docket no. 545) was a 55-page declaration, accompanied by four more exhibits. The lion's share of the declaration consists of characterizations of the case, legal arguments, predictions about what would be shown if an evidentiary hearing were held, and speculation about evidence neither Wilkes nor anyone else has found.

The first nine exhibits Wilkes attached to his first filing are all either part of the record already, or (to the extent they are relevant) can be judicially noticed. The next 25 exhibits (*see* Docket no. 542 at 97 (table of exhibits)) are all unauthenticated documents of various kinds, whose significance Wilkes never clearly explains. They consist of various emails and letters, meeting notes, court documents, business records, and Wilkes' own unsigned and undated declaration from 2015 giving his version of the facts. Wilkes does
///

10

07cr0330-LAB and
15cv2841-LAB

not say, for example, which if any of these documents were used, or could have been used, at trial.

Wilkes' second filing attaches four more documents, all of which are either part of the record already or judicially noticeable. (*See* Docket no. 545 at 57 (table of exhibits).) It does not authenticate most of the documents attached to his first filing. It does attempt to explain the significance of some documents, however. (*See, e.g., id.* at 9, ¶¶ 34–35 (discussing declarations by Duke Cunningham and Mike Williams); 11 ¶ 40 (sample contract); 12, ¶ 43 (Perfectwave Technologies project documents); 14, ¶ 50 (correspondence regarding Panama project); 15, ¶ 52–54 (business documents connected with Panama project); 16, ¶¶ 57–58 (federal contracting handbook and program task orders); 17, ¶¶ 61–63 (motion in this case, co-defendant's plea agreement, and Parkview investment references).) The significance of some other documents is explained in the list of witnesses. (*Id.* at 28, ¶¶ 28–29; 29, ¶ 30.)

Most of the documents Wilkes refers to in his second filing are not attached. While a few are individual documents, most are broad categories of documents. Wilkes did not attach any of these, and apparently does not have most of them, although he believes they exist. (*See id.* at 2–19.) The Court construed this part of his filing as a second renewed motion for discovery, and denied it. (Docket no. 550.)

Wilkes does not explain which, if any, of these documents he asked Geragos to investigate, and what Geragos did about it. One thing, however, is perfectly clear: this is <u>not</u> a list of exhibits Geragos should have discovered but didn't. Wilkes' response says that either Geragos had the evidence (but apparently chose not to use it), or else it was unavailable to him for reasons behind his control. (*See* Docket no. 542 at 2 (stating that the exhibits identified in the declaration were in Wilkes' own files, confiscated by the FBI, or withheld by the government).) Wilkes also identifies 96 named witnesses, unnamed

///

///

///

11

witnesses, or categories of witnesses[2] he would like to call at the evidentiary hearing. He also predicts what each of the 96 would say. Almost none of these witnesses could testify about the effectiveness of Geragos' representation, however. Most of them are witnesses that Wilkes thinks would help prove his innocence. Wilkes says these witnesses were "known to him" (*i.e.* to Wilkes himself) before trial. (Docket no. 542 at 2.) But he does not say which of them, if any, he suggested Geragos interview. Clearly it could not have been all, because a number of them are unidentified. Nor does he say what he said to Geragos about them. As with the documentary evidence, it is clear this is <u>not</u> a list of witnesses Geragos should have called but didn't. A number of these witnesses did testify at trial, and Geragos cross-examined them. The fact that he obtained their testimony through cross rather than direct examination is unimportant.

Only a few potential witnesses Wilkes identifies could speak to the effectiveness of Geragos' representation: Geragos himself, as well as several of his associates and assistants; Shereen Charlick, Ruben Cahn, and other Federal Defenders personnel; Nancy Luque, a previous attorney for Wilkes who allegedly "spoke with [Geragos] about his failure to prepare and his reliance on a continuance"; and attorney Gene Iredale, who met with Wilkes in connection with a different criminal case. (Docket no. 545 at 42–43, ¶¶ 83–92.)

Even assuming these few witnesses were to appear at a hearing and testify as Wilkes predicts, their testimony would not help him. Most of them are cumulative of what Geragos' declaration already says: that he was hoping for a continuance, and that when it was denied, he could not review all the evidence he wanted to. In other words, they would

---

[2] Wilkes said he intended to call three expert witnesses (Docket no. 545 at 19–20, ¶¶ 1–3), and predicted what they would say. None of these witnesses is named or is even an actual person, however. He says he wants to call "Scotty," identified only as a San Diego limousine driver who he says witnessed an interaction between Wilkes and Frank Collins in 1996. (*Id.* at 25 ¶ 17.) He seeks to call "MZM Personnel," a category including various unidentified executives, staff, and other personnel, as well as Mitchell Wade's lawyer and an unnamed former Senate staff member. (*Id.* at 34–35, ¶ 47.) He would also like to call an unnamed Inspector General for the Department of Defense. (*Id.*, ¶ 75).

12

testify that the Court's denial of a continuance meant that Geragos was prevented from effectively representing Wilkes, something Geragos himself has already said, and which the Court has found insufficient. The only other testimony Wilkes points to is evidence that the discovery was not produced in an easily searchable form, and Geragos' failure to use focus groups or similar research methods in order to prepare and test a defense. Geragos' declaration already speaks to the state of discovery production. And the proffered Iredale testimony about focus groups would not advance Wilkes' cause because professional standards do not require the use of focus groups or the like.

As noted, in his declarations Geragos himself never admitted committing unprofessional errors, and none of the facts he has sworn to suggest he committed any. The declaration of Shereen Charlick, which Wilkes also relied on, similarly does not identify any unprofessional errors Geragos committed. There is no reason to believe their testimony at an evidentiary hearing would be any different than their declarations.

Furthermore, witnesses' opinions about Geragos' level of preparation or about what Geragos himself felt at the time are not necessary. The Court is the finder of fact, its job includes drawing its own conclusion based on the *Strickland* standard. Nothing suggests any of the witnesses is prepared to testify to anything other than a general unpreparedness on Geragos' part. None witnessed or would point out any unprofessional error, such as Geragos' failure to investigate key witnesses or evidence. And Geragos' own subjective opinion about his preparedness is irrelevant. *See Harrington*, 562 U.S. at 109.

No witness, not even Wilkes himself, has specifically identified any testimony or other evidence that Wilkes told Geragos about and that Geragos ignored. Wilkes' catalog of evidence in his response can fairly be described as his own idealized version of how the trial should have gone. If the Court were to hold an evidentiary hearing on Geragos' preparation, Wilkes would have no relevant evidence to present other than evidence that is already part of the record.

Wilkes proffered no evidence as to portions of Claim 8 concerning Geragos' alleged failure to advise him about testifying or about the case against him, or as to any of Claim

14. He also blamed Geragos for refusing to provide him with his file, but Geragos explains that in June of 2012, he sent all of Wilkes' files (18 bankers' boxes in all) to Federal Defenders, who were assuming the representation at that time. (Docket no. 536, ¶ 10.) Wilkes has not challenged this, nor does it appear he would have any way of knowing what Geragos sent to Federal Defenders. The record also makes clear Federal Defenders had access to documents of the kind that would be found in a client's file.

**Discussion of Evidence**

### Claim 14

The government represented that it offered Wilkes no plea deal. Geragos, in his declaration filed in response to the Court's order, agrees the government never made any plea offers. (Docket no. 536, ¶ 4.) He declares that Wilkes said he would not plead to anything under any circumstances, and that per Wilkes' wishes, he did not seek a plea deal. (*Id.*) Wilkes has not contested any of this.

Wilkes' contention that prior to trial Geragos never discussed the strength of the case against him is contradicted by the record. Wilkes' own accusations concerning Geragos' failure to investigate also make clear Geragos did talk with him about the government's case. Had he not done so, Wilkes could not have suggested witnesses he thought would rebut the government's case. Moreover, Geragos met daily with Wilkes during trial, and discussed the case with him. (*See id.*, ¶ 8.)

### Claim 8: Wilkes' Testimony

In his reply declaration, Geragos explains that although he did interview Wilkes at length and prepare him to testify, he strategically avoided over-preparing him, so as to avoid Wilkes' testimony appearing staged. (Docket no. 536, ¶9.) This also explains why he would have refused to allow Shereen Charlick and Ruben Cahn to spend a weekend preparing Wilkes. Wilkes' own filings make clear Geragos did prepare him to testify, although apparently Wilkes did not recognize Geragos' efforts as preparation. (*See, e.g.*, Docket no. 490 (Wilkes' declaration from 2015) at 12 and 32, ¶ 8.)

/ / /

14

07cr0330-LAB and
15cv2841-LAB

Wilkes never explains what he means by the "potential dangers of testifying and cross-examination." (*Id.* at 12.) The only harm apparent in the record is that the Court found Wilkes had obstructed justice by lying under oath about his involvement with two prostitutes whose services were part of a bribe to Cunningham. This was addressed in the Court's December 12, 2017 order. (*See* Docket no. 535 at 19 n.8.)

**Claims 1 and 8: Failure to Investigate and Prepare**

This is by far the most substantial of Wilkes' remaining claims. He alleged that Geragos failed to prepare adequately for trial, failed to review available discovery, failed to discuss events with Wilkes to find out his version of the facts, failed to conduct a proper pretrial investigation, and failed to interview any of the defense witnesses that Wilkes identified. This, Wilkes contends, resulted in no defense strategy at all. He also claims that Geragos repeatedly admitted that he was ineffective as an advocate.

This claim is almost entirely foreclosed by the Ninth Circuit's rulings. Wilkes raised a related claim on direct appeal, contending that the Court abused its discretion by denying Geragos' request for a continuance, and arguing that he was prejudiced by Geragos' inability to use certain evidence at trial. In *Wilkes I*, the Ninth Circuit held that Wilkes had not shown prejudiced by the denial of a continuance. 662 F.3d at 543. The fact that this was raised before and decided by the Ninth Circuit means Wilkes cannot now claim there was some valuable evidence Geragos would have discovered if he had not mistakenly relied on obtaining a continuance. The Ninth Circuit's holding included a determination that evidence Geragos supposedly failed to find as a result would not have changed the verdict. *Id.*

Geragos' declaration in reply contradicts most of these claims. He admits being hampered, but not because of any unprofessional errors. (*See* Docket no. 536, ¶ 5 (denying that he made any unprofessional errors and denying that he ever told Wilkes he did).) Rather, he says that factors beyond his control such as the Court's rulings and the government's late production of documents made it impossible for him to represent Wilkes competently. (*See id.* ¶¶ 5 (blaming government's slow production and the Court's denial

15

of a continuance), 6 (stating that documents in the FBI office containing exculpatory evidence were discovered only *after* trial), 7 (explaining that the Court's denial of a continuance forced him to make strategic decisions about how his trial team should best use their time, including not interviewing some witnesses).) In other words, Geragos admits not doing a good job, but attributes it all to the Court, the government, or other factors that he could not control. The Ninth Circuit has already said Wilkes was not prejudiced by those things.

Although the Court did not ask him to, Geragos volunteered that he thought the government had wrongly withheld documents that, if he had had them at trial, could have won Wilkes an acquittal. (*Id*., ¶6.) He does not identify any of these documents, so there is no way to evaluate his speculation. But more to the point, Geragos did not have these documents; they turned up only after trial, when Geragos was no longer representing Wilkes. Their unavailability could not have been Geragos' fault.

Geragos admits he expected that a continuance would be granted, giving him more time to prepare for trial. (*Id.*, ¶ 5.) Wilkes seizes on this, pointing to it as an unprofessional mistake. This example of the kind of "hindsight" evaluation that the Supreme Court has warned courts not to engage in. *Strickland*, 466 U.S. at 689. Geragos says he believed a continuance was justified in light of what he describes as slow, unorganized, and inefficient production of evidence, or "document dumps" by the government. (Docket no. 536, ¶ 5.) At the time, he believed it should and would be granted. (*Id.*)

Furthermore, the record makes clear that he had some additional reason for believing it might be granted. John Michael, Wilkes' co-defendant at the time, had complained of headaches, nausea, and other symptoms. He was found to be suffering from bacterial meningitis, and Michael's counsel had separately moved for a continuance. (*See* Docket no. 542 at 15–17 (Hearing Transcript, Oct. 1, 2007).) Instead, the Court severed Michael's case and proceeded with the charges against Wilkes. But Geragos had hoped that the continuance would be granted, and he joined in it. (*Id.* at 17:21–18:7.) When that failed, he argued at length based on the large volume of evidence that he needed more time. (*Id.*

16

at 19:11–21:2.) He then argued at great length about the government's late and inefficient production of evidence, and the difficulty of reviewing it all with his legal team. (*Id.* at 22:8–32:5.) Although he realized the Court was not inclined to grant a continuance, he obviously had reasons he believed justified an exception. In hindsight it turned out he was wrong, but at the time he at most knew a continuance <u>might</u> be denied.

The Ninth Circuit's ruling in *Wilkes II* is significant as well, although in an indirect fashion. In that case, he was represented by Shereen Charlick, whom he has not accused of failure to investigate or prepare. After trial, Charlick had obtained "new evidence" in the form of a declaration by Cunningham as well as various records relating to a fraud scheme by a co-defendant. *See id.* at 1109–10. She moved for a new trial on the basis of this, and the Court denied both that motion and her motion for reconsideration. On appeal, the Ninth Circuit held it was clear that this evidence would <u>not</u> probably result in acquittal. *Id.* at 1110. Presuming, as the Court must, *see Strickland*, 466 U.S. at 689, that Charlick's investigation of the evidence was competent, it follows that she would have investigated as thoroughly as required, and put forward the best evidence she could in favor of a new trial. This would have included any new evidence Wilkes pointed her to,[3] any she uncovered after the start of trial, and any she turned up after trial. Because the best evidence she had was, in the Ninth Circuit's judgment, clearly insufficient to undermine the verdict, *see* 744 F.3d at 1110, weaker and more cumulative evidence would not have changed anything either.

Any claim of Geragos' own ineffectiveness is further undermined by the fact that some of the supposed errors were not his own. Before Wilkes retained Geragos, he bounced from lawyer to lawyer. Geragos describes the state of the case he inherited as deplorable. (*See* Docket no. 542 at 19:11–19.) Furthermore, any suggestion he was forced

---

[3] Accepting as true Wilkes' representations that he was dissatisfied with Geragos for not looking into the witnesses and other evidence he pointed Geragos to, Wilkes would have had every reason to point out the same evidence to Charlick. Either he did not do so, or he did but she decided not to investigate it, or she did investigate it and found it unhelpful. Any of those three possibilities undermines Wilkes' claim.

17

to do all the work himself is inaccurate. Others at his firm were assisting with discovery. (*See id.* at 22:24–23:1 (representing to the Court that he had four or five people from his firm were complaining about the difficulty of reviewing discovery for this case).) Two attorneys from his firm assisted him during trial. And later in the case, Shereen Charlick and Ruben Cahn also assisted him with reviewing and preparing evidence.

The Court can, and does, rely on its own recollections of the trial, and its observations and evaluation of Geragos' performance. Some of these were mentioned in its earlier rulings, but they bear repeating. The Court, of course, is familiar both with good trial advocacy, and also with the hallmarks of unprepared, weak, or poorly thought-out advocacy. The Court observed Geragos during the whole trial, and had multiple opportunities to develop its own assessment of his level of preparation and his effectiveness.

The Court found Geragos' representation to be masterful and much more effective than most defense attorneys. In spite of supposed lack of preparation and unreadiness for trial the Court is now being told about, it was evident he was in command of the case from day one. Even if his declaration had not made clear what his trial strategy was (Docket no. 536, ¶¶7–8), the trial itself would have made perfectly clear that he had thoroughly considered it, developed a sound strategy, and carried it out effectively. His decision to defend against the government's case rather than focus on developing and putting on an affirmative defense (*id.*, ¶7) was sound. His opening statement bore no signs of having been quickly or carelessly thrown together. Instead, it specifically and correctly predicted what the case would look like, and specifically addressed what would or would not be shown. An attorney who can predict accurately what the government's case is going to look like cannot reasonably be accused of lack of pretrial preparation.

His performance during trial also showed he was thoroughly prepared and had considered his strategy with care and skill. He knew which witnesses to cross-examine, and which not to. He was familiar with the discovery and he used it to devastating effect during cross-examination. His own declaration that he and his staff researched the

18

07cr0330-LAB and
15cv2841-LAB

witnesses aligns well with the Court's observations during trial. His knowledge of each witness and of the evidence seemed to be complete. The fact that he called almost no witnesses of his own did not hurt his case, because he cross-examined the government's witnesses (many of whom are among the witnesses Wilkes now says he should have called) so effectively, eliciting what he needed to from them.

Geragos' team had the evidence well-organized, and available for use as needed. He often called for specific items, and the assisting attorneys were able to produce them quickly, without searching, allowing him to use it right away. There was no indication that anything was missing, or that Geragos could not remember or find some important piece of evidence.

Geragos gave a comprehensive and powerful closing argument, offering an explanation for every point the government made. It bears emphasis, too, that the government's case was powerful. *See Wilkes I*, 662 F.3d at 541 ("This was not a close case."); *Wilkes II*, 744 F.3d at 1110 (describing the case against Wilkes as a "mountain of evidence"). The fact that Geragos kept the jury deliberating for four days attests to his effectiveness.

Finally, although the Court has not cited or analyzed it here, the government filed a comprehensive brief addressing Wilkes' nitpicking of Geragos' representation, and supporting its arguments with exhibits. (Docket no. 547.) The government correctly points out that the evidence Wilkes blames Geragos for not finding and introducing falls into one of three categories: either it was in fact introduced at trial, or its absence at trial was unsuccessfully raised on appeal, or else it would not have been admitted or available even if Geragos had tried to offer it. The government's very thorough and well-documented arguments are well-taken, and they too show why Claims 1 and 8 must fail.

**Conclusion and Order**

As *Strickland* recognizes, all attorneys are fallible, and a defendant is only entitled to reasonably competent counsel. On the basis of the record, additional evidence that was received, the Court's own recollections and observations, and common sense, the Court

19

must conclude that Geragos committed no unprofessional errors. Any errors he may have committed behind the scenes were either corrected before he got to court, or were completely neutralized by his in-court performance. Not only was Geragos not ineffective; he was in fact quite effective. It is absolutely untrue to say that Geragos was no longer functioning as counsel within the meaning of the Sixth Amendment. *See Strickland*, 562 at 687.

Nor has Wilkes established any prejudice from Geragos' supposed errors. Even now, he cannot point to anything specific that Geragos did or failed to do that would have created the substantial likelihood of acquittal.

For these reasons, and for the reasons set forth in the Court's December 12, 2017 order, it is absolutely clear Wilkes' remaining three claims do not warrant relief.

The petition is **DENIED**, and a certificate of appealability is also **DENIED**. *See Welch v. United States*, 136 S.Ct. 1257, 1263–64 (2016).

**IT IS SO ORDERED**.

Dated: December 21, 2018

_Larry A. Burns_
Hon. Larry Alan Burns
United States District Judge